UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------X

DERMOT J. MACSHANE,

        Plaintiff,

   - against -

THE CITY OF NEW YORK; CHARLES
MICHAEL MARTINEZ, Deputy Chief Surgeon,
Medical Division; DANIEL SWEENEY,
Sergeant, Counseling Services Unit; SUZANNE
GIMBLET, Detective, Counseling Services Unit,
each being sued individually and in their official
capacities as employees of the Police Department
of the City of New York,

        Defendants.

---------------------------------------------------------X

DEREK MILLER,

        Plaintiff,

   - against -

THE CITY OF NEW YORK; CHARLES
MICHAEL MARTINEZ, Deputy Chief Surgeon,
Medical Division; DANIEL SWEENEY,
Sergeant, Counseling Services Unit; SUZANNE
GIMBLET, Detective, Counseling Services Unit,
each being sued individually and in their official
capacities as employees of the Police Department
of the City of New York,

        Defendants.

---------------------------------------------------------X

**MEMORANDUM AND
ORDER**

05-CV-06021 (RRM)(RML)

05-CV-06024 (RRM)(RML)

-----------------------------------------------------------X

ROBERT MCNAMARA,

                    Plaintiff,

       - against -                       05-CV-06025 (RRM)(RML)

THE CITY OF NEW YORK; CHARLES MICHAEL MARTINEZ, Deputy Chief Surgeon, Medical Division; DANIEL SWEENEY, Sergeant, Counseling Services Unit; SUZANNE GIMBLET, Detective, Counseling Services Unit, each being sued individually and in their official capacities as employees of the Police Department of the City of New York,

                    Defendants.

-----------------------------------------------------------X

DONALD HERLIHY,

                    Plaintiff,

       - against -                       06-CV-407 (RRM)(RML)

THE CITY OF NEW YORK; DANIEL SWEENEY, Sergeant, Counseling Services Unit; SUZANNE GIMBLET, Detective, Counseling Services Unit, SAM WILLIS, Counseling Services Unit; FRANK S. VALUZZI, Captain; BRIAN P. DOHERTY, Lieutenant, PBMS Investigations Unit, each being sued individually and in their official capacities as employees of the Police Department of the City of New York,

                    Defendants.

-----------------------------------------------------------X

---------------------------------------------------------X

MICHAEL DIAMOND,

                          Plaintiff,

             - against -                                 06-CV-4817 (RRM)(RML)

THE CITY OF NEW YORK; CHARLES MICHAEL MARTINEZ, Deputy Chief Surgeon, Medical Division; DANIEL SWEENEY, Sergeant, Counseling Services Unit; SUZANNE GIMBLET, Detective, Counseling Services Unit; DONNA MARIE GOMEZ, Lieutenant, Harbor Unit, each being sued individually and in their official capacities as employees of the Police Department of the City of New York,

                          Defendants.

---------------------------------------------------------X

BETZAYDA FRATICELLI,

                          Plaintiff,

             - against -                                 06-CV-4933 (RRM)(RML)

THE CITY OF NEW YORK; ROBERT DE PUTRON, Captain Patrol Borough Staten Island; THOMAS GLEAVY, Captain 120th Precinct; CHARLES MICHAEL MARTINEZ, Deputy Chief Surgeon, Medical Division; DANIEL SWEENEY, Sergeant, Counseling Services Unit; SUZANNE GIMBLET, Detective, Counseling Services Unit, each being sued individually and in their official capacities as employees of the Police Department of the City of New York,

                          Defendants.

---------------------------------------------------------X

```
-----------------------------------------------------------X
```

TAMMIE HALL ORDONEZ,

                 Plaintiff,

       - against -

THE CITY OF NEW YORK; CHARLES
MICHAEL MARTINEZ, Deputy Chief Surgeon,
Medical Division; DANIEL SWEENEY,
Sergeant, Counseling Services Unit; SUZANNE
GIMBLET, Detective, Counseling Services Unit,
each being sued individually and in their official
capacities as employees of the Police Department
of the City of New York,

                 Defendants.

06-CV-4935 (RRM)(RML)

```
-----------------------------------------------------------X
```

JOHN SPACCAFORNO,

                 Plaintiff,

       - against -

THE CITY OF NEW YORK; CHARLES
MICHAEL MARTINEZ, Deputy Chief Surgeon,
Medical Division; DANIEL SWEENEY,
Sergeant, Counseling Services Unit; SUZANNE
GIMBLET, Detective, Counseling Services Unit,
each being sued individually and in their official
capacities as employees of the Police Department
of the City of New York,

                 Defendants.

06-CV-6175 (RRM)(RML)

```
-----------------------------------------------------------X
```

```
---------------------------------------------------------X
```
PAUL SCHUBERT,

        Plaintiff,

    - against -                    06-CV-6278 (RRM)(RML)

THE CITY OF NEW YORK; CHARLES MICHAEL MARTINEZ, Deputy Chief Surgeon, Medical Division; DANIEL SWEENEY, Sergeant, Counseling Services Unit; SUZANNE GIMBLET, Detective, Counseling Services Unit, each being sued individually and in their official capacities as employees of the Police Department of the City of New York,

        Defendants.
```
---------------------------------------------------------X
```
LEERIC HAMPTON,

        Plaintiff,

    - against -                    06-CV-6279 (RRM)(RML)

THE CITY OF NEW YORK; CHARLES MICHAEL MARTINEZ, Deputy Chief Surgeon, Medical Division; DANIEL SWEENEY, Sergeant, Counseling Services Unit; SUZANNE GIMBLET, Detective, Counseling Services Unit, each being sued individually and in their official capacities as employees of the Police Department of the City of New York,

        Defendants.
```
---------------------------------------------------------X
```

```
---------------------------------------------------------X
```
UNA MCGEOUGH,

                         Plaintiff,

           - against -                      06-CV-6732 (RRM)(RML)

THE CITY OF NEW YORK; CHARLES
MICHAEL MARTINEZ, Deputy Chief Surgeon,
Medical Division; DANIEL SWEENEY,
Sergeant, Counseling Services Unit; SUZANNE
GIMBLET, Detective, Counseling Services Unit;
PETER HAMMER, Sergeant, Manhattan
Warrants Squad; JOHN SULLIVAN, Detective,
Manhattan Warrants Squad; JOHN ROMERO,
Detective, Manhattan Warrants Squad, each
being sued individually and in their official
capacities as employees of the Police Department
of the City of New York,

                        Defendants.
```
---------------------------------------------------------X
```
ROSLYNN R. MAUSKOPF, United States District Judge.

       A number of current and former police officers of the New York City Police Department

(the "NYPD") filed separate actions against the City of New York (the "City") and individuals

employed in the NYPD's Counseling Services Unit (the "CSU") (collectively, "defendants"),

alleging violations of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12112, *et

seq.*; the New York State Human Rights Law (the "NYSHRL"), N.Y. Exec. Law §§ 296, *et seq.*;

and the New York City Human Rights Law (the "NYCHRL"), N.Y.C. Admin. Code §§ 8-107, *et

seq.* Plaintiffs bring claims sounding in disability discrimination, hostile work environment

related to that alleged disability discrimination, and retaliation. One plaintiff also alleges false

arrest, and another alleges a hostile work environment claim based on gender. All eleven related

cases were consolidated for purposes of defendants' summary judgment motion pursuant to Federal Rule of Civil Procedure ("Rule") 56.[1] (*See* 1/14/10 Minute Entry.)

Each of these lawsuits ultimately stems from the NYPD's decision to refer each plaintiff to the CSU for evaluation following alleged incidents of serious misconduct related to alcohol use – some involving criminal conduct – that the NYPD found the plaintiff-police officers to have committed. As a result of those incidents, the NYPD internally referred plaintiffs to the CSU for evaluation. Following individualized interviews and diagnostic assessments, the CSU concluded that plaintiffs suffered from alcohol abuse or dependence. The NYPD, consequently, required each plaintiff to undergo inpatient and/or outpatient alcohol abuse treatment as a condition of their continued employment. Most plaintiffs complied, successfully completing the treatment program and returning to full duty, while some plaintiffs refused to participate and were eventually suspended or even fired.

The common thread connecting plaintiffs' lawsuits is a cause of action for disability discrimination. Plaintiffs contend that the CSU, motivated in part by "myths, fears, and stereotypes" associated with alcoholism, illegitimately perceived them to be alcoholics by using diagnostic techniques that defendants knew, or should have known, were incomplete, unreliable, and biased toward findings of alcohol abuse or addiction. Plaintiffs expressly disclaim, furthermore, having engaged in the alcohol-fueled misconduct that led to their referral to the CSU. Indeed, plaintiffs insist that defendants' proffered evidence to that effect is either misleading or outright false – that is to say, a mere pretext or bad-faith "mechanism" for the CSU

---

[1] All plaintiffs, except for Miller, are represented by the same counsel and submitted a single set of papers in opposition to defendants' motion for summary judgment. Particular documents referred to herein can be found on Docket Number 05-CV-6021, unless otherwise indicated. Miller, proceeding *pro se*, submitted his own opposition. Where appropriate, the Court considered any arguments raised in either set of papers as applicable to both sets of plaintiffs. *See F.T.C. v. Medical Billers Network, Inc.*, 543 F. Supp. 2d 283, 303 (S.D.N.Y. 2008). Accordingly, except where otherwise noted, "plaintiffs" includes both Miller and the ten represented plaintiffs.

to effectuate its policy of unreasonably forcing officers into treatment programs based on flawed diagnoses.

For the reasons set forth at length below, the Court concludes that plaintiffs have not made out an actionable claim that defendants discriminated against them on the basis of a perceived disability, and that plaintiffs' causes of action therefore fail to withstand summary judgment.  Accordingly, defendants' motion for summary judgment (No. 05-CV-6024, Doc. Nos. 102–06, 111–12, 129–31) is hereby GRANTED and the complaints are dismissed.

## PLAINTIFFS' FAILURE TO COMPLY WITH LOCAL RULE 56.1

Under Local Rule 56.1, a movant is required to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried" along with "citation[s] to evidence which would be admissible."  Local Rule 56.1(a), (d).  In response, the nonmoving party – here, plaintiffs – must provide the Court with "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party," which includes citations to admissible evidence for "each statement controverting any statement of material fact."  Local Rule 56.1(b), (d); *see* Individual Rules of Judge Roslynn R. Mauskopf, Rule III(B)(3).

Plaintiffs (except for Miller, whose submission is separately addressed in connection with his claim) failed to comply substantially with their obligations under this rule.  Although plaintiffs submitted a response to defendants' Local Rule 56.1 statement, (*see* Pl's 56.1 (Doc. No. 124)), in the majority of instances, plaintiffs did not identify evidence that controverted defendants' statements.  For example, in response to several statements, plaintiffs simply stated, "Deny."  (*See, e.g.*, *id.* ¶¶ 392–401, 411–14, 420–33.)  As to several others, plaintiffs admitted that the cited exhibit on which defendants relied was an "official NYPD document," but denied

"the factual accuracy of the statement." (*See, e.g.*, *id.* ¶¶ 248–49, 251–53, 257–59, 268–70, 272–76, 353–56, 619–25, 627–29, 638–41.) Concerning several other statements, plaintiffs stated that they had "not been provided with sufficient information to admit or deny," but failed to offer an affidavit pursuant to Rule 56(d) requesting additional discovery. (*See, e.g.*, *id.* ¶¶ 6, 19, 24–29.)

Instead of directly addressing defendants' factual claims in their Local Rule 56.1 statement, plaintiffs submitted a separate document entitled "Rule 56.1 Consolidated Counterstatements," which contains approximately 92 pages and 709 paragraphs of purported factual statements unconnected to defendants' Local Rule 56.1 statement. (*See* Pl's 56.1 Consolidated Counterstatements (Doc. No. 125).) None of these submissions comply with the letter or spirit of Local Rule 56.1. *See Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001) ("The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties.").

When a paragraph in a moving party's Local Rule 56.1 statement is not specifically controverted by the opposing party, it "will be deemed admitted for the purposes of the motion." Local Rule 56.1(c); *see* Fed. R. Civ. P. 56(e)(2). Although the Court has discretion "to overlook a party's failure to comply with local court rules," *Holtz*, 258 F.3d at 73, it declines to do so here. *See Bank of America v. Fischer*, No. 11-CV-2044 (DRH), 2013 WL 685614, at *2 (E.D.N.Y. Feb. 25, 2013) (noting that the defendant's failure to comply with Local Rule 56.1 was "inexcusable as he was represented by counsel"). Accordingly, all material facts set forth in defendants' Local Rule 56.1 statement are deemed admitted to the extent that they are adequately supported with record evidence and not specifically controverted by plaintiffs with a citation to

evidence in the record.  *See Holtz*, 258 F.3d at 74.  The following material facts are thus gleaned primarily from defendants' Local Rule 56.1 statement, (*see* Def's 56.1 (Doc. No. 121)), and the affidavits and exhibits submitted in connection thereto.

## BACKGROUND

### I.      The NYPD's Counseling Services Unit

The CSU is an NYPD unit that assists police officers who are experiencing difficulties with, among other things, alcohol abuse.  (Def's 56.1 ¶ 3.)  The NYPD developed the CSU to provide such officers with an opportunity to rehabilitate themselves and then, ideally, return to full-duty service.  (*Id*. ¶ 23.)  The CSU's objective is the early detection and referral of personnel potentially suffering from addiction issues for treatment and supervision.  (*See id.* ¶ 5.)[2]

An officer can be referred to the CSU by NYPD supervisors or medical personnel, or can seek the CSU's services on his or her own.  (*Id*. ¶ 7.)  When an officer visits the CSU, a counselor conducts an intake interview to gather information and assess whether the officer is suffering from alcohol dependence and abuse, as defined in the Diagnostic and Statistical Manual IV ("DSM IV").  (*Id*. ¶ 8.)  The assessment process is individualized and includes the use of a diagnostic interview form that contains questions relevant to the disease of alcohol dependency.  (*Id.* ¶ 9, 12.)  The CSU also examines the documentation pertaining to the basis for the referral, and will contact family members and others close to the officer to confirm or gather additional information.  (*Id.* ¶ 12.)  The counselor then checks with the clinical case manager to

---

[2]  In New York, the Office of Alcoholism and Substance Abuse Services ("OASAS") regulates alcoholism and substance abuse treatment centers.  *See* N.Y. Mental Hygiene Law § 19.07.  For many years, the CSU received a "community organization exemption" by the predecessor organization to the OASAS, whereby CSU counselors were entitled to "certification" after working in the unit for a given period of time.  (Def's 56.1 ¶ 24.)  In 2003, the OASAS no longer permitted the CSU to use this exemption, and its counselors were required to undergo training to become Certified Alcohol and Substance Abuse Counselors.  (*Id.* ¶ 25.)  Many of the CSU counselors are now certified, although some have been trained only by observing and working with more senior CSU staff.  All CSU counselors collaborate or consult with certified counselors during the intake process.  (*Id.* ¶ 17)

determine whether any additional information is needed or whether a diagnosis can be made. (*Id.* ¶ 13.)  If there is an insufficient basis to conclude that the officer has met the DSM IV definition of alcohol dependence or abuse, the CSU will offer the officer an alcohol education course.[3]  (*Id.* ¶ 14.)  However, if the CSU determines that the officer satisfies the DSM IV criteria, the counselor, in consultation with the clinical case manager, will choose an inpatient or outpatient treatment facility that best suits the officer's needs.  (*Id.* ¶ 15.)

This entire process is confidential.  (*See* Eichenholtz Decl. Ex. 3 (Doc. No. 120-1) at 22 (ECF pagination) ("Records maintained by the Counseling Services Unit are absolutely confidential and not duplicated or forwarded anywhere within the Department. . . . Members participating in this program will not jeopardize their assignments or promotional opportunities. However, the member may be disciplined for specific acts of misconduct.").)

## II.    Plaintiffs' Referrals to the CSU

Plaintiffs were referred to the CSU and their causes of action stem from the circumstances of that referral and treatment.  The relevant facts giving rise to the CSU referral for each plaintiff is set forth below.

### A.    Dermot MacShane

Plaintiff Dermot MacShane ("MacShane") joined the NYPD as a police officer in 1986. (Def's 56.1 ¶ 31.)  MacShane was first referred to the CSU in 2002 after his arrest and suspension from the NYPD for a domestic incident in which he struck his wife, who claimed that MacShane often drank heavily before returning home in an inebriated state.  (*Id.* ¶¶ 34, 38–39.) MacShane was criminally convicted of second-degree harassment (a violation), referred to the CSU, and completed an alcohol education program.  (*Id.* ¶¶ 36, 42–44.)

---

[3] Plaintiffs Dermot MacShane and Michael Diamond were offered alcohol education courses the first time that they were referred to the CSU.  (*Id.* ¶ 14.)

MacShane's second referral occurred in 2004 after being found unfit for duty. (*Id.* ¶¶ 45–46, 59, 63, 67.) MacShane reported late for his scheduled tour; his breath smelled of alcohol, he was perspiring and red in the face, and he was disheveled, unsteady, and belligerent. At the time, MacShane was also taking two prescription medications that had alcohol contraindications. (*Id.* ¶¶ 48, 50–51, 53, 61, 64.) By MacShane's own account, he had consumed approximately four alcoholic drinks before arriving for duty that day. (*See* Goldberg Decl. Ex. F (Doc. No. 123-2) at 75:10–15.) The NYPD suspended MacShane and ordered that he report to the CSU, which determined that he met the criteria for an alcohol abuse diagnosis. (*Id.* ¶¶ 45, 71–79.)

In March 2004, the NYPD required MacShane to attend a roughly one-month inpatient alcohol treatment program; he was eventually discharged with a poor prognosis. (*Id.* ¶¶ 80–84, 93–94, 97.) MacShane was then ordered to participate in outpatient group treatment sessions and Alcoholics Anonymous meetings. (*Id.* ¶¶ 99–103, 119–20, 125, 134.) MacShane repeatedly failed to comply with this treatment regimen, and the NYPD ultimately suspended him. (*Id.* ¶¶ 148–49.) On February 1, 2006, a post-suspension hearing was held before an assistant deputy police commissioner to consider MacShane's non-compliance. (*Id.* ¶¶ 150–51.) The assistant deputy commissioner concluded that MacShane was guilty of failing to comply with a lawful order and recommended that he be dismissed from the NYPD. (*Id.* ¶¶ 156–57.) MacShane subsequently retired following an unrelated disciplinary incident. (*Id.* ¶¶ 159–62.)

## B.    Derek Miller[4]

Plaintiff Derek Miller ("Miller") became a police officer in 1995.  (Def. 56.1 ¶ 167.)  On September 10, 2004, after completing his tour of duty, Miller went to a restaurant with friends and drank alcohol.  (*See id*. ¶¶ 174–76.)  Later that night, Miller's landlord, a retired police officer, called the NYPD to report that Miller's car was blocking the driveway and that Miller

---

[4] Miller, appearing *pro se*, makes three principal objections to the evidence put forth in defendants' Local Rule 56.1 statement: 1) that the evidence is inadmissible hearsay and therefore not properly considered under Local Rule 56; 2) that the evidence was uncertified in violation of Local Rule 56, and; 3) that the evidence is irrelevant to the core issues in dispute in this case.  These objections are without merit.  As to Miller's hearsay objections, the bulk of the evidence proffered by defendants is either not hearsay or is admissible under exceptions to the hearsay rule.  For example, any statements attributable to Miller, (*see* Eichenholtz Decl. Exs. 51–52, 59), are statements of a party opponent and are, by definition, not hearsay, *see* Fed. R. Evid. 801(d)(2), while the declaration of Sergeant Sweeney, (*see* Eichenholtz Decl. Ex. 1), was made under penalty of perjury pursuant to 28 U.S.C. § 1746, and would therefore be admissible at trial.  *See* Fed. R. Evid. 801(c)(1); Fed. R. Civ. P. 56(c).  The Long Island Center for Recovery and St. Vincent Medical Center notes, (*see* Eichenholtz Decl. Exs. 57–58, 65–67), were made for and reasonably pertinent to medical treatment, *see* Fed. R. Evid. 803(4), and were kept in the course of a regularly-conducted activity, *see* Fed. R. Evid. 803(6).  The CSU notes, (*see* Eichenholtz Decl. Ex. 64), fitness-for-duty reports, (*see* Eichenholtz Decl. Ex. 61–62), and NYPD memos, (*see* Eichenholtz Decl. Exs. 60, 70–71), were also kept in the course of a regularly-conducted activity, *see* Fed. R. Evid. 803(6), (Sweeney Decl. (05-CV-6024, Doc. No. 130) ¶¶ 4, 6), and, in any event, are not being offered to prove the truth of the matter asserted, but rather the state of mind of defendants as to the employment decisions regarding Miller.  *See Kaur v. New York City Health and Hospitals Corp*., 688 F. Supp. 2d 317, 323 (S.D.N.Y. 2010) (quoting *McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006)).  Similarly, the findings of the NYPD assistant deputy commissioners, (*see* Eichenholtz Decl. Exs. 63, 69), were factual findings from a legally-authorized investigation, *see* Fed. R. Evid. 803(8), and are being offered to show defendants' state of mind.  Finally, a transcript of a deposition, (*see* Eichenholtz Decl. Exs. 7, 51–56, 68), may not be in a form that is admissible, but the underlying testimony would be admissible at trial subject to its compliance with the Federal Rules of Evidence, and therefore may be considered by the Court at the summary judgment phase.  *See Housing Works, Inc. v. Turner*, No. 00-CV-1122 (JCF), 2004 WL 2101900, at *5 (S.D.N.Y. Sept. 14, 2004).

As for Miller's objection that the exhibits were not certified, the Court finds sufficient circumstantial evidence to indicate that the documents are authentic and reliable, and will therefore consider them in this motion. (*See* Eichenholtz Decl. (Doc. No. 120) (declaring under threat of perjury that documents submitted in connection with motion are true and correct); Eichenholtz Decl. Ex. 222 (05-CV-6024, Doc. No. 129) (certifications of relevant deposition testimony).)  *See Kaur*, 688 F. Supp. 2d at 324–25.  Miller's objection to the authenticity of *all* the defense documents based on purported discrepancies found on three diagnostic interview forms exchanged in discovery, (*see* Miller Aff. (05-CV-6024, Doc. No. 126) ¶¶ 10–22), is also unavailing as these purported discrepancies are immaterial and in no way undermine the authenticity of the remaining documents.

As for Miller's relevancy objections, the standard for relevance under Federal Rules of Evidence 401 and 402 is broad.  Because the submissions go to the circumstances of Miller's referrals to the CSU, and the reasons for defendants' alleged adverse employment actions, they are relevant and admissible.

Having found Miller's evidentiary objections to be without merit, the Court will consider defendants' factual averments relating to Miller in their Local Rule 56.1 statement to be undisputed inasmuch as they are supported by admissible evidence in the record.

refused to move the vehicle. (*Id*. ¶¶ 178–79.) The responding officers observed that Miller was disheveled, slurring his speech, and smelled of alcohol, (*id*. ¶¶ 183, 185, 189), and the landlord reported that, of late, Miller had been drinking more frequently. (*Id*. ¶ 184.) Miller's duty captain also responded to the apartment and found Miller unfit for duty. (*Id*. ¶¶ 182, 190.) A few days later, Miller was referred to the CSU.[5] (*Id*. ¶ 193.) A counselor interviewed Miller, his partner, and his landlord. Miller was diagnosed with alcohol dependency and he agreed to participate in a twenty-eight day inpatient program followed by outpatient treatment. (*Id*. ¶¶ 196–204, 208.) Miller eventually completed this regimen and was restored to full duty. (*Id*. ¶¶ 213–14.)

On February 12, 2008, during his deposition in this lawsuit, Miller acknowledged that he had resumed drinking alcohol. (*Id*. ¶¶ 215–17.) As a result, the NYPD referred Miller back to the CSU, but he repeatedly refused to cooperate with any proposed treatment program. (*Id*. ¶¶ 218–21, 225–26, 232–33, 236–38.) The NYPD suspended Miller three times – on February 14, March 17, and April 16, 2008 – for his refusal to obey orders, and, after a hearing on May 5, 2008, an assistant deputy commissioner found him guilty of refusing to obey orders. (*Id*. ¶¶ 231, 235, 238–41.) The assistant deputy commissioner recommended that Miller be terminated for his misconduct, and the Police Commissioner adopted that recommendation and dismissed Miller from the NYPD. (*Id*. ¶ 243.)[6]

---

[5] Miller was charged with being unfit for duty and operating a motor vehicle while intoxicated, and a departmental disciplinary hearing was held on July 5, 2005. Miller was eventually found not guilty of all charges. (*Id*. ¶ 191.) This determination was not made until *after* Miller had been evaluated and treated by the CSU. (*Id*. ¶ 192.)

[6] In recommending termination, the assistant deputy commissioner emphasized that "[t]he Police Department is a paramilitary organization where the need for discipline and compliance with orders is key to the performance of its operation," and that Miller's "lack of compliance and unwillingness to come to terms with his possible problem with alcohol make him a danger not only to himself but to others. The Police Department is an agency with high standards of discipline and decorum. Police Officers are held to that high standard particularly when dealing with

## C.    Robert McNamara

Plaintiff Robert McNamara ("McNamara") became an NYPD officer in 1987 and was promoted to detective in 2002.  (*Id.* ¶¶ 244–46.)  In March 2004, police officers responded to McNamara's home based on a 911 call by his wife, who stated that her husband had been drinking alcohol all day and threatened to hurt her and damage the house.  (*Id.* ¶¶ 248, 252–53.)  The officers found McNamara to be drunk and combative, and discovered his loaded service weapon unattended on an entertainment center.  (*Id.* ¶¶ 257–61.)  Later that night, McNamara's duty captain confiscated his firearms and placed him on restricted duty, noting that his wife had expressed concern regarding McNamara's "use of alcohol" and its impact on his "ability to control his temper."  (*Id.* ¶¶ 265–66, 269–70.)

McNamara was referred to the CSU, and, upon being interviewed, a counselor learned that McNamara typically drank eight or more beers per night; the counselor also spoke with McNamara's wife, father, and supervisor.  The CSU determined that inpatient treatment was necessary, and McNamara signed a treatment contract that included a twenty-eight day inpatient stay, group counseling, and Alcoholics Anonymous meetings.  (*Id.* ¶¶ 272–73, 280–83, 314, 316; Eichenholtz Decl. Ex. 73 (Doc. No. 120-9) at 79–80 (ECF pagination).)  McNamara completed the inpatient component of the plan, but refused to comply with the other requirements.  Consequently, the NYPD placed him on modified duty from June 2004 to January 2005.  (Def's 56.1 ¶¶ 324–26, 333, 335.)  In February 2005, the CSU offered McNamara another opportunity to participate in a treatment program.  McNamara again refused and was suspended for a month.  (*Id.* ¶¶ 337–41, 345.)  Following that suspension, McNamara finally agreed to adhere to the

superiors.  [Miller] demonstrated that he no longer wants to meet this standard."  (Eichenholtz Decl. Ex. 69 (Doc. No. 120-8) at 48, 50 (ECF pagination); Def's 56.1 ¶ 242.)

treatment plan.  He completed the plan on June 28, 2005, whereupon he returned to full duty.
(*Id*. ¶¶ 346–47, 357.)

On August 2, 2005, a disciplinary hearing was held pertaining to the charges that
McNamara had refused to comply with the CSU's directives, and had failed to safeguard his
firearm properly at the time of the original domestic incident.  (*Id*. ¶¶ 359–60.)  An assistant
deputy commissioner found McNamara guilty and suspended him for an additional thirty days.
(*Id.* ¶ 363; Eichenholtz Decl. Ex. 81 (Doc. No. 120-10) at 69, 71 (ECF pagination).)  McNamara
retired from the NYPD in 2007.  (Def's 56.1 ¶ 371.)

### D.     Donald Herlihy

In fall 2005, plaintiff Donald Herlihy ("Herlihy") was an NYPD detective assigned to the
Queens Warrants Division.  (*Id*. ¶ 372.)  In the early morning of October 21, 2005, Herlihy was
driving an unmarked police vehicle while on duty with his partner, Detective Michael Grady.
(*Id*. ¶¶ 378–79.)  At approximately 2:00 a.m., Grady purchased a six-pack of beer.  (*See*
Eichenholtz Decl. Ex. 128 at 155; Goldberg Decl. Ex. BBB (Doc. No. 123-13) at 4 (ECF
pagination).)  Forty minutes later, a citizen called the police about an individual – later
determined to be Detective Grady – exiting a vehicle, placing a beer bottle on the ground, and
urinating on a building wall.  (Def's 56.1 ¶¶ 386, 388.)  The NYPD traced the vehicle to Herlihy.
(*Id*. ¶¶ 389–91.)  Herlihy and Grady were ordered back to their precinct stationhouse.  There,
three superior officers examined Herlihy, determined that he had been drinking, and arrested him
for driving under the influence of alcohol.  (*Id.* ¶ 393, 396–99, 401; Eichenholtz Decl. Ex. 122
(Doc. No. 120-2) at 66–68; Eichenholtz Decl. Exs. 130–32.)  Herlihy refused to take a
Breathalyzer test.  (Def's 56.1 ¶ 403–04; Eichenholtz Decl. Ex. 134.)  Ultimately, Herlihy was
suspended from the NYPD, but not criminally prosecuted.  (Def's 56.1 ¶¶ 406–08.)

Upon returning from suspension, Herlihy was ordered to report to the CSU. (*Id.* ¶¶ 408–09.) A counselor interviewed Herlihy as well as his family, neighbors, and coworkers, ultimately determining that he should attend a twenty-eight day inpatient alcohol treatment program. (*Id.* ¶ 410; Eichenholtz Decl. Ex. 139 at 29.) Herlihy repeatedly refused to participate in the program and, consequently, the NYPD suspended him for thirty days. (Ex. 138; Eichenholtz Decl. Ex. 139 at 29–30; Def's 56.1 ¶ 420.) When Herlihy returned from suspension, he reported to the CSU, again refused treatment, and was suspended once again. (Def's 56.1 ¶ 421.) This pattern transpired once more and resulted in a third suspension. (*Id.* ¶ 422.)

In April 2006, the NYPD charged Herlihy with eleven disciplinary infractions. After a hearing, an assistant deputy commissioner found Herlihy guilty of wrongful possession of an intoxicant, improper operation of an NYPD motor vehicle, being unfit for duty, refusing to submit to a breath test, and failure to obey lawful orders to comply with the CSU's directives. (*Id.* ¶¶ 423–25.) [7] The assistant deputy commissioner recommended that Herlihy be terminated, (Eichenholtz Decl. Ex. 139 at 40), underscoring that "even if [Herlihy] were willing to participate in an alcohol treatment program, the alcohol-related misconduct he committed would raise questions concerning his suitability to remain a uniformed member of the service. When combined with his noncompliance, [Herlihy's] lacking suitability becomes clear." (Def's 56.1 ¶ 432.) The Police Commissioner approved this recommendation and terminated Herlihy. (*Id.* ¶ 433.)

---

[7] With respect to Herlihy's failure to cooperate with the CSU, the assistant deputy commissioner found that the NYPD had a "substantial basis for ordering [Herlihy] to cooperate with [the] CSU," that "ordering [Herlihy] to enter an alcohol treatment program was clearly lawful and in the public interest," and that the NYPD has the "authority to impose orders and a police officer must comply with these orders, even if he believes the order to be unlawful." (*Id.* ¶¶ 430–31.)

### E.     Michael Diamond

Plaintiff Michael Diamond ("Diamond") became a police officer in 1989 and was assigned to the NYPD's Harbor Unit in 2004.  (Def's 56.1 ¶¶ 436, 460.)  Diamond was first referred to the CSU in January 2004 due to an incident in which he struck his teenage daughter after having consumed alcohol.  (*Id*. ¶¶ 445–48, 452, 455.)  Diamond agreed to participate in an educational program for alcohol abuse and remained on full duty.  (*Id*. ¶ 448, 452, 455–57.)

In December 2004, the Harbor Unit's Integrity Control Officer referred Diamond to the CSU, noting his pattern of tardiness and her belief that he was struggling with alcohol abuse, including that he was borderline unfit for duty on several occasions.[8]  Upon interviewing Diamond and his family, the CSU concluded that he was alcohol dependent and offered him inpatient treatment.  Diamond initially refused that treatment and the NYPD suspended him,[9] at which point he complied by entering an inpatient program in January 2005.  (*Id.* ¶¶ 460–63, 470–76, 482–87; Goldberg Decl. Exs. R, T (Doc. No. 123-4) at 34–35, 63, 67–68 (ECF pagination); Eichenholtz Decl. Ex. 142 (Doc. No. 120-13) at 61, 67–69, 76–77 (ECF pagination).)  By June 2005, Diamond had successfully completed all facets of his treatment regimen.  However, while being deposed in this lawsuit, Diamond admitted that he had recently consumed alcohol.  (Def's 56.1 ¶ 489.)  As a result, the NYPD referred him back to the CSU and offered him a new treatment plan, which Diamond accepted.  (*Id*. ¶¶ 489–93.)

---

[8] The event that immediately precipitated Diamond's referral to the CSU occurred on December 28, 2004, when Diamond's lieutenant ordered his boat back to the stationhouse upon Diamond displaying a red face and puffy eyes.  (*See* Goldberg Decl. Ex. T. (Doc. No. 123-4) at 63 (ECF pagination).)

[9] Diamond believed that the NYPD had no right to send him to inpatient treatment because "they never caught [him drinking] on duty, off duty, unfit for duty."  (*Id.* ¶ 475).  In his deposition, however, Diamond admitted that "every once in a while" he drank "a beer or two" while on duty, including while on an NYPD boat.  (Def's 56.1 ¶¶ 441–42.)

### F.    Betzayda Fraticelli

Plaintiff Betzayda Fraticelli ("Fraticelli") joined the NYPD in 1987 and was promoted to detective in 2000.  On July 28, 2004, while taking a "sick day," the police were called to her apartment building based on an incident in which Fraticelli had confronted a group of people gathered on the roof, including at least two residents of the building.  Fraticelli was alleged to have brandished her firearm, screamed and cursed at these individuals, ordered them to depart, and pushed one person.  The police confiscated Fraticelli's gun and, upon being transported to a precinct stationhouse, she was found unfit for duty.  Fraticelli was swaying with bloodshot eyes, did not know the identity of her immediate supervisor or when she was promoted, provided the incorrect address for her command, and was unable to state coherently why she had taken a sick day.  Fraticelli also had less than the required number of rounds in her firearm magazine.  (*Id.* ¶¶ 494–501, 506, 510–20; Goldberg Decl. Ex. W (Doc. No. 123-5) at 23–24 (ECF pagination); Eichenholtz Decl. Ex. 158 (Doc. No. 120-14) at 117–19 (ECF pagination).)

As a result of this incident, the NYPD suspended Fraticelli for ten days, charged her with various disciplinary infractions, and referred her to the CSU.  (Def's 56.1 ¶¶ 529, 533; Eichenholtz Decl. Exs. 156, 158 (Doc. No. 120-14) at 77, 119 (ECF pagination).)  The CSU concluded that Fraticelli met the criteria for alcohol abuse, and she agreed to a treatment plan that included a twenty-eight day inpatient program.  (*See* Eichenholtz Decl. Ex. 156 (Doc. No. 120-14) at 52; Eichenholtz Decl. Ex. 157 (Doc. No. 120-14) at 115; Eichenholtz Decl. Ex. 160 (Doc. No. 120-14) at 123 (ECF pagination); Def's 56.1 ¶¶ 549–51.)  By February 2005, Fraticelli had successfully completed the CSU's treatment plan.  (*Id.* ¶¶ 557–58.)

### G.    Tammie Hall Ordonez

Plaintiff Tammie Hall Ordonez ("Ordonez") became a police officer in 1992.  (*See*

Eichenholtz Decl. Ex. 163 (Doc. No. 120-15) at 50 (ECF pagination).)  On January 22, 2006,

Ordonez's husband notified the NYPD that Ordonez had threatened him with a gun.  He stated,

moreover, that Ordonez had history of drinking alcohol and abusing him, and that he had

obtained an order of protection against her.  (Def's 56.1 ¶¶ 573–74.)  Ordonez appeared before

the NYPD's Internal Affairs Bureau, which removed her firearms and placed her on modified

duty, and she was eventually referred to the CSU.[10]  (*Id*. ¶¶ 575–77, 589.)  Ordonez was ordered

to obtain alcohol treatment or face suspension.  (*Id.* ¶¶ 594–604.)  Ordonez complied by

completing a twenty-eight day inpatient program, whereupon she returned to full duty in July

2006.  (*Id*. ¶¶ 606, 610.)

### H.    John Spaccaforno

Plaintiff John Spaccaforno ("Spaccaforno") became a police officer in 1997.  (*Id.* ¶ 612.)

In November 2004, Spaccaforno's wife called the police to report that her husband had been

drinking alcohol and had physically prevented her from exiting their home.  Mrs. Spaccaforno

stated that she had been trying to leave the marriage for several months, but that Spaccaforno

warned her that he would commit suicide if she did so.  (*Id.* ¶¶ 619–21, 624–25.)  Spaccaforno's

wife subsequently obtained an order of protection against him, and the NYPD placed

Spaccaforno on modified duty.  (*Id*. ¶¶ 628–30.)  Spaccaforno was referred to the CSU, and he

admitted, upon being interviewed, that he had consumed alcohol prior to the incident with his

wife, as well as prior to driving a car containing his three-year old daughter.  (*Id*. ¶¶ 633–39.)

---

[10] Ordonez reported that she typically drank two glasses of wine every other day, but occasionally drank two bottles of wine per week during periods of stress.  (*Id.* ¶¶ 580–81.)  She acknowledged the existence of two prior domestic incidents in the previous year, each of which occurred after she had been drinking.  (*See id.* ¶¶ 582–87.)  Ordonez's husband, who was also interviewed, stated that his wife had a drinking problem.  (*Id.* ¶ 589.)

Furthermore, Spaccaforno's wife advised the CSU counselor that Spaccaforno drank nightly and would sometimes become intoxicated. (*Id.* ¶ 640.) The CSU determined that Spaccaforno met the criteria for alcohol abuse, he completed a twenty-eight day inpatient treatment program, and he was restored to full duty in June 2006. (*Id.* ¶¶ 641–49, 655–57; Eichenholtz Decl. Ex. 172 (Doc. No. 120-16) at 58.)

In March 2008, after he had filed this lawsuit, Spaccaforno was promoted to detective. (Def's 56.1 ¶ 616.) A few days later, Spaccaforno testified at his deposition that he was once again drinking alcohol. (*Id.* ¶ 659.) As a result, he was referred back to the CSU, which determined that he should receive continued treatment. Spaccaforno accepted a treatment plan pursuant to which he agreed to attend counseling sessions at an outpatient facility and group sessions at the CSU. (*Id.* ¶¶ 660–63.)

## I.     Paul Schubert

Plaintiff Paul Schubert ("Schubert") became a police officer in 1990. (*See* Eichenholtz Decl. Ex. 185 (Doc. No. 120-17) at 41 (ECF pagination).) In May 2005, the police responded to Schubert's home after his wife called 911 to report that her husband had threatened to commit suicide. She stated that Schubert was taking antidepressants, had been drinking excessively as of late, was physically abusive toward her, and often threatened that she would be "dead" if she left him. (Def's 56.1 ¶¶ 667–75, 688–89; Eichenholtz Decl. Ex. 220 (Doc. No. 127) at 19–20 (ECF pagination).) Schubert was placed on modified duty, his firearm and shield were removed, and he was referred to the CSU. (Def's 56.1 ¶¶ 695, 697; Eichenholtz Decl. Ex. 220 at 21.) Schubert was eventually ordered to attend alcohol counseling, which he completed before returning to full duty in June 2006. (Def's 56.1 ¶¶ 700–03, 710–21, 725–26.)

### J.  Leeric Hampton

Plaintiff Leeric Hampton ("Hampton") became a police officer in 1993.  (*Id*. ¶ 728.)  On September 18, 2005, Hampton's wife called the police to report that he had been acting irrationally, including drinking tequila straight from the bottle while looking at old family photographs.  (*Id*. ¶ 738–41.)  Police officers responded to Hampton's home, secured his weapon, and transported him to a hospital to be medically evaluated.  (*Id*. ¶ 739.)  Hampton thereafter met with a psychologist in the NYPD's Psychological Evaluation Section; Hampton admitted having consumed half a bottle of tequila on the day of the incident and not remembering what happened thereafter.  (*Id*. ¶¶ 743–45.)  Hampton was referred to the CSU and eventually completed a twenty-eight day inpatient treatment program, whereupon he returned to full duty.  (*Id*. ¶¶ 745, 748–51, 754, 757.)

### K.  Una McGeough

Plaintiff Una McGeough ("McGeough") became a police officer in 1995.  (*Id*. ¶ 759.)  On the morning of April 7, 2005, after McGeough reported for duty at the Manhattan Warrant Squad, her supervisor received reports that McGeough was very drunk and stumbling around the stationhouse.  (*Id*. ¶¶ 772, 774–75, 778.)  The supervisor removed McGeough's gun and shield as well as contacted her union delegate, who responded to the stationhouse and drove McGeough to the CSU.  (*Id*. ¶¶ 779–81, 785–87.)  McGeough told a CSU counselor that she had consumed more than a bottle of wine the prior evening, that she had lost control of her drinking, and that this was impacting her work.  (*Id.* ¶¶ 789–91.)  McGeough's supervisor also advised the counselor that McGeough had reported to work on numerous occasions with alcohol on her breath.  (*Id*. ¶ 793.)  McGeough agreed to be treated for alcohol dependency and completed a twenty-eight day inpatient program.  (*Id*. ¶¶ 794–95, 800.)  In January 2006, McGeough was

promoted to sergeant, and she was subsequently transferred to a confidential assignment unit in which she investigated police misconduct.  (*Id*. ¶¶ 767–68.)

At her January 30, 2008 deposition in this case, McGeough testified that she had consumed alcohol since completing the treatment, which resulted in the NYPD referring her back to the CSU.  (*Id*. ¶¶ 801–02.)  The CSU found that McGeough was in relapse, and she accepted additional outpatient treatment.  (*Id*. ¶¶ 803–04.)

While McGeough was assigned to the Manhattan Warrant Squad (the "Squad"), she managed the Squad's "club account," which was a fund to which members contributed for parties and gifts.  (*Id*. ¶¶ 806–07.)  McGeough was also responsible for removing money from the Squad's vending machines and depositing that money into the club's bank account.  (*Id*. ¶ 809.)  At one point, several thousand dollars went missing from the account.  Although an innocent explanation was ultimately found, some officers in the Squad initially accused McGeough of stealing it.  (*Id*. ¶¶ 810–14.)  On approximately five occasions, fellow officers cut newspaper articles into pieces and placed them on her desk to "portray stories" that McGeough was a "bitch" and "had taken [the] money."  (*Id*. ¶ 816.)  McGeough usually left these cut-outs on her desk, although her supervisor eventually removed them.  *(Id*. ¶¶ 818–19.)  McGeough never filed a complaint with the NYPD over these occurrences.  (*Id*. ¶ 820.)  On one occasion, McGeough found her bulletproof vest in a garbage can.  (*Id*. ¶¶ 821–23.)  On another occasion, two animal figurines that McGeough kept on her desk were arranged to depict a sexual act.  (*Id*. ¶¶ 824–28.)

### III.    Procedural History

Plaintiffs filed their complaints at different times between December 2005 and 2006, raising a variety of claims under the ADA, RICO, § 1981, § 1983, the NYSHRL, and the

NYCHRL, as well as tort claims based in state common law. The cases were consolidated and originally assigned to the Honorable Sterling Johnson, Jr., who, following motion practice, dismissed several of the claims brought by particular plaintiffs. *See MacShane v. City of New York et al.*, No. 05-CV-6021 (SJ)(RML), 2007 WL 1062936 (E.D.N.Y. Mar. 30, 2007); *Miller v. City of New York et al.*, No. 05-CV-6024 (SJ)(RML), 2007 WL 1062505 (E.D.N.Y. Mar. 30, 2007); *McNamara v. City of New York et al.*, No. 05-CV-6025 (SJ)(RML), 2007 WL 1062564 (E.D.N.Y. Mar. 30, 2007); *Herlihy v. City of New York et al.*, No. 06-CV-407 (SJ)(RML), 2007 WL 1062593 (E.D.N.Y. Mar. 30, 2007). Several other plaintiffs then voluntarily withdrew some of their claims. (*See* Def's 56.1 ¶ 1). The cases were then randomly transferred to the undersigned, (1/3/08 Order), and eventually consolidated for the purposes of dispositive motion practice. (1/14/10 Minute Entry.) At this stage, the only remaining claims for all plaintiffs are those against the City for disability discrimination under the ADA, and those against the City and the various individual defendants for disability discrimination under the NYSHRL and the NYCHRL. (*Id.*) In addition, Herlihy brings a false arrest claim, (*see* Pl's 56.1 ¶ 435), and McGeough brings a gender-based hostile work environment claim under Title VII, the NYSHRL, and the NYCHRL. (*See id.* ¶ 834.)[11]

## IV.    Plaintiffs' Arguments

Plaintiffs argue that the CSU – acting with "discriminatory animus" deriving from "myths, fears, and stereotypes" associated with alcoholism, (Pl.'s Br. (Doc. No. 126-1) at 31–32) – falsely perceived them to be alcoholics based on testing methods that were biased toward

---

[11] Plaintiff Michelle Figueroa's lawsuit (Docket No. 06-CV-6277) was originally consolidated with these cases. However, after Figueroa withdrew her claims challenging any aspect of her counseling and treatment by the CSU, (*see* 06-CV-6277, Doc. No. 36), her action was treated separately for the purpose of dispositive motion practice. Defendants have since moved separately for summary judgment against Figueroa. Contemporaneously with the issuance of this opinion, the Court is issuing a separate opinion granting that motion as to Figueroa and dismissing her complaint.

findings of alcohol abuse or dependence and that defendants knew or should have known were inadequate and unreliable.  (*Id.* at 52–54, 77–78.)  Plaintiffs posit that, as a consequence, they suffered adverse employment actions by being forced to undergo inpatient and/or outpatient alcoholism treatment regimens, being stigmatized as alcoholics, and – as to those plaintiffs who refused to comply with the regimens – being suspended or even fired.  Plaintiffs deny having engaged in the underlying alcohol-fueled misconduct that precipitated their evaluation and treatment by the CSU, (*see id.* at 49), and insist that defendants' proffered non-discriminatory grounds for requiring such treatment were pretextual – as plaintiffs put it, defendants were "less interested in whether [p]laintiffs' were on duty while under the influence of alcohol (and plaintiffs in fact were not under the influence of alcohol) than in looking for a mechanism to force the plaintiffs into inpatient treatment."  (*Id.* at 30, 49.)[12]

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine issue of material fact exists "if the

---

[12] Plaintiffs' theory of discrimination is captured more fully in the following passage from plaintiffs' memorandum of law:

> In the present cases, the CSU defendants were firm believers in the value of treatment for alcohol addiction, and they believed police officers were particularly at risk because of the stressful nature of the job.  Considering the invalid, inaccurate, and unreliable test methods used to diagnose the plaintiffs, and considering that the tests were administered by the unlicensed and unqualified individuals at CSU, a jury could reasonably find that Defendants were less interested in whether Plaintiffs' [sic] were on duty while under the influence of alcohol (and plaintiffs in fact were not under the influence of alcohol), than in looking for a mechanism to force the plaintiffs into inpatient treatment.

(*Id.* at 30.)

evidence is such that a reasonable jury could return a verdict for the nonmoving party."
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a genuine issue of material fact exists, the evidence of the nonmovant "is to be believed," and the Court must draw all "justifiable" or "reasonable" inferences in favor of the non-moving party. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *see Brosseau v. Haugen*, 543 U.S. 194, 195 n.1 (2004). Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*,'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original), and "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (citing cases). In other words, the nonmovant must invoke more than just "metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, by offering "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256.

Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to [its] case." *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (quoting *Celotex*, 477 U.S. at 322) (quotations omitted) (alteration in original). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996) (citing *Anderson*, 477 U.S. at 247–48).

As plaintiff Miller is proceeding *pro se*, the Court construes his pleadings liberally, *see Haines v. Kerner*, 404 U.S. 519, 520–21 (1972); *Boykin v. KeyCorp*, 521 F.3d 202, 213–14 (2d Cir. 2008) (citation omitted), and reads them to "raise the strongest arguments that they suggest." *Green v. United States*, 260 F.3d 78, 83 (2d Cir. 2001) (citations omitted).  However, the Court "need not argue a *pro se* litigant's case nor create a case for the *pro se* which does not exist." *Molina v. New York*, 956 F. Supp. 257, 259 (E.D.N.Y. 1995).

## DISCUSSION

### I.       Disability Discrimination Under the ADA

Disability discrimination claims under the ADA are reviewed under the familiar burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Sykes v. North Fork Bank*, No. 07-CV-1102 (FB), 2009 WL 5042531, at *1 (E.D.N.Y. Dec. 16, 2009) (citing *Heyman v. Queens Vill. Comm. for Mental Health*, 198 F.3d 68, 72 (2d Cir. 1999)).[13]  A plaintiff bears the initial burden of establishing a *prima facie* case of discrimination under the ADA.  *See Sykes*, 2009 WL 5042531, at *1.  To do so, the plaintiff must show, by a preponderance of the evidence, (1) that his employer is subject to the ADA, (2) that he suffers from a disability within the meaning of the ADA or, as here, is perceived to be so by his employer, (3) that he was otherwise qualified to perform the essential functions of his job with or without reasonable accommodation, and (4) that he suffered an adverse employment action because of his disability.  *See Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008).  Congress's motivation for the inclusion of misperceptions of disabilities in the statutory definition was to express its "understanding that unfounded concerns, mistaken beliefs, fears,

---

[13] As discussed in the text *infra*, courts in certain other ADA cases have declined to employ this burden-shifting test. However, as addressed below, this Court finds that the application of the *McDonnell Douglas* framework is appropriate in analyzing plaintiffs' claims.

myths, or prejudice about disabilities are often just as disabling as actual impairments, and [its] corresponding desire to prohibit discrimination founded on such perceptions." 29 C.F.R. pt. 1630, app. § 1630.2(l) (internal quotations and citation omitted).

Once the plaintiff has established a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *See McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006). The defendant satisfies that burden if the reason given, "taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993). Typically, it is not for courts to second-guess the quality or wisdom of the reason, so long as it is not unlawfully discriminatory. *See id.*

If the defendant produces a legitimate, non-discriminatory reason for the adverse employment action, the plaintiff must put forth evidence suggesting that it is more likely than not that the reasons offered are mere pretext designed to cover up the employer's actual discriminatory intent. *See Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)). The plaintiff does not have to show that the employer's reasons are false, or that they played no role in the decision; rather, he must show merely that the proffered reasons were not the only reasons, and that discriminatory animus was at least one of the motivating factors for the adverse employment action. *See Cronin v. Aetna Life Ins., Co.*, 46 F.3d 196, 203 (2d Cir. 1995). "The pretext inquiry thus normally focuses upon factual questions such as whether the asserted reason for the challenged action comports with the defendant's policies and rules, whether the rule applied to the plaintiff has been applied uniformly, and whether the putative non-discriminatory purpose was stated only after the allegation of discrimination." *DeMarco v. Holy Cross High Sch.*, 4

F.3d 166, 171 (2d Cir. 1993). The ultimate burden of persuading the finder of fact that the

employer intentionally discriminated lies with the plaintiff at all times during this burden-shifting

process. *See Holt v. KMI-Cont'l, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996).

This Court is aware that, in a recent opinion involving similar facts, a district court

eschewed this burden-shifting framework in partially denying the defense's motion for summary

judgment. In *Makinen v. City of New York*, the plaintiffs were police officers who, as here,

argued that the CSU had illegitimately regarded them as suffering from the disability of alcohol

abuse, and discriminated against them under the ADA by requiring their participation in

treatment regimens as a condition of maintaining their jobs. *Makinen v. City of New York*, No.

11-CV-7535 (ALC), 2014 WL 5036747 (S.D.N.Y. Sept. 30, 2014). The *Makinen* plaintiffs,

notably, did "not allege that [the] [d]efendants' adverse employment actions were motivated by

any animus toward their perceived disability," but rather, "in contrast to many antidiscrimination

cases," directed their "gripe" purely at the "legitimacy of [the] [d]efendants' perception of them

as disabled." *Id.* at *10.

In analyzing the *Makinen* plaintiffs' discrimination claim, the district court judge had to

decide, as a preliminary matter, whether a cause of action for disability discrimination under the

ADA was even cognizable absent some proof of discriminatory animus. In the absence of

Second Circuit authority on this issue, the court found that such a claim was indeed cognizable.

*See id.* at *7–8 (citing, *inter alia*, *Deane v. Pocono Medical Center*, 142 F.3d 138 (3d Cir. 1998),

and *Nelson v. City of New York*, No. 11-CV-2732 (JPO), 2013 WL 4437224 (S.D.N.Y. Aug. 19,

2013) (holding that liability extended to discrimination based solely on misperceived disabilities

in case involving claim that NYPD terminated officer based on misperceived psychological

impairment)); *contrast Wooten v. Farmland Foods*, 58 F.3d 382, 385–86 (8th Cir. 1995) (finding

no actionable ADA claim where employer's perceptions of plaintiff as disabled were "not based upon speculation, stereotype, or myth, but upon a doctor's written restriction"); *see also School Board of Nassau Co. v. Arline*, 480 U.S. 273, 284 (1987) (observing, under analogous Rehabilitation Act, that "society's accumulated myths and fears about disability and diseases are as handicapping as are the physical limitations that flow from actual impairment").

Next, the *Makinen* Court went on to conclude that, under the circumstances of that case, the burden-shifting analytical framework – *i.e.*, asking whether the defendant could show a non-discriminatory reason for the complained-of conduct, and whether the plaintiffs could, in turn, demonstrate that any proffered reason was pretextual – was inapplicable. *See Makinen*, 2014 WL 5036747, at *7 n.2 (citing *McMillan*, 711 F.3d at 129 (in context of ADA claim concerning whether schizophrenic's timely arrival at work was "essential function" of job, determining that, when the "parties agree that the employer complains of conduct that is the direct result of the employee's disability," the *McDonnell Douglas* analysis is not "helpful," as there is "no need to evaluate whether the employer's adverse employment action made in response to that conduct is pretextual") (citing, in turn, *Teahan v. Metro-N. Commuter R.R. Co.*, 951 F.2d 511, 514, 516 (2d Cir. 1991))). The court focused solely on deciding whether the plaintiffs had established a *prima facie* claim of disability discrimination, which turned on whether, under the third element of an ADA cause of action, the police officers had been qualified to perform the essential functions of their jobs. *Id.* at *7 n.2, 13.[14]

---

[14] That analysis, by extension, implicated the defendants' so-called "direct-threat defense," whereby an employer can avoid liability by proving that, because of the employee's actual or perceived disability, he or she constitutes a "direct threat to themselves or others and is thereby unqualified for the position." *Id.* (quoting 42 U.S.C. § 12113(b)). The *Makinen* Court eventually decided – in what it characterized as a "close call" – that the plaintiffs had presented admissible evidence that the CSU's diagnostic methodology was unreasonable, thereby creating a dispute of material fact as to whether the officers who were subjected to alcohol abuse treatment were actually unqualified for their positions by posing a direct threat to themselves or others. *See id.* at *12–15.

While aspects of *Makinen* factually resemble the lawsuits at hand, the Court finds that, unlike in *Makinen*, the *McDonnell Douglas* burden-shifting analysis should be applied here. That is because, from their pleadings to their summary judgment opposition papers, plaintiffs have espoused a theory of liability predicated on discriminatory animus.[15] As stated, plaintiffs argue that the CSU utilized flawed and inaccurate diagnostic techniques, that defendants knew or should have known about the alleged inadequacies of such methods, and that, in the final analysis, the CSU's decision-making was not based on reasonable beliefs or judgments, but rather biased toward findings of alcohol abuse or dependence based on myths, fears, and stereotypes associated with the disability of alcoholism. Plaintiffs contend, furthermore, that defendants' extensive proffered evidence of plaintiffs' alcohol-related misconduct (which triggered the CSU's involvement in the first place) was either fictitious or exaggerated – that is, little more than a pretext or bad-faith "mechanism" for unreasonably forcing them into treatment based on the CSU's misguided policies. Considering the nature of plaintiffs' arguments and the manner in which this case has been litigated, the Court concludes that the issues of discriminatory animus and pretext are decidedly in play, and that the burden-shifting framework thus constitutes the appropriate analytical model in which to review and adjudicate plaintiffs' claims.[16]

---

[15] The Court, then, need not pass on whether a claim of disability discrimination can be cognizable even absent a showing of discriminatory animus.

[16] As discussed in the text *infra*, the pre-2009 version of the ADA applies to the instant lawsuits, and the Court separately concludes that plaintiffs have failed to establish a *prima facie* claim of disability discrimination because they have not shown that, under the predecessor statute, defendants "regarded them" as suffering from a perceived disability. It bears emphasis that *Makinen*, conversely, involved the amended, post-2008 version of the ADA. *See Makinen*, 2014 WL 5036747, at *11 n.3. Thus, even if this court adopted the analysis in *Makinen*, it would nonetheless find that plaintiffs have not made out a *prima facie* cause of action for disability discrimination.

## II.    *Prima Facie* Discrimination: "Regarded As" Claim

The Court must first determine whether plaintiffs have put forward sufficient evidence to establish a *prima facie* case of disability discrimination under the ADA.  One of the threshold elements is whether plaintiffs have shown that defendants "regarded" them as suffering from a perceived disability under the ADA.  Plaintiffs have not met this burden.

All of the events of which plaintiffs complain transpired before 2009, meaning that the pre-2009 version of the ADA applies here.  *See Ragusa v. Malverne Union Free School Dist.*, 381 F. App'x 85, 88 n.2 (2d Cir. 2010) ("Although Congress amended the ADA in 2008 to expand its coverage . . . we here apply the version of the statute in effect during the time at issue") (internal citations omitted).[17]  Under that previous (but operative) version of the ADA, a plaintiff bringing a "regarded as" disability discrimination claim must "establish that the defendants perceived him as substantially limited in his ability to perform the major life activities of walking, standing, sitting, lifting, bending and/or working."  *McDonald v. City of New York*, 786 F. Supp. 2d 588, 611–12 (E.D.N.Y. 2011); *see Widomski v. State Univ. of N.Y. at Orange*, 748 F.3d 471, 475 (2d Cir. 2014); *Hilton v. Wright*, 673 F.3d 120, 128 (2d Cir. 2012).

Plaintiffs have failed to do so here.  Critically, following their alcohol-related misconduct, each plaintiff was allowed to continue working, albeit on modified duty, provided that he or she obtain alcohol-abuse treatment.  The fact that defendants did not view plaintiffs as

---

[17] Congress has since amended the statute, providing that an individual is eligible for coverage under the "regarded as" prong if he or she "establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."  42 U.S.C. § 12102(3)(A); *Makinen*, 2014 WL 5036747, at *11 n.3.  Because Congress did not expressly provide for retroactive application in the amendments, every circuit to pass on the matter has concluded that the amendments do not apply retroactively to conduct that occurred before the effective date of January 1, 2009.  *See Nyrop v. Indep. Sch. Dist.*, 616 F.3d 728, 734 n.4 (8th Cir. 2010) (adopting this holding and collecting cases from the First, Fifth, Sixth, Seventh, Ninth, and D.C. Circuits); *see also Colwell v. Rite Aid Corp.*, 602 F.3d 495, 501 n.5 (3d Cir. 2010) (declining to determine whether amendments are retroactive, but observing that every circuit to consider issue has found them not to be retroactive); *Ragusa*, 381 F. App'x at 88 n.2.

capable of the rigors of full-duty police work does *not* mean that defendants perceived them as being substantially limited in their ability to perform major life activities. *See Colwell v. Suffolk Cnty. Police*, 158 F.3d 635, 647 (2d Cir. 1998) (superseded by 42 U.S.C. § 12102(3)(A) (2008)) ("To prove that they were regarded as substantially limited in their ability to work, the officers bore the burden of proving that the County 'perceived [them] to be incapable of working in a broad range of jobs suitable for persons of their age, experience, and training.' The fact that the officers were believed to be unable to wrestle with disturbers of the peace is not enough.") (citations omitted); *Dellavolpe v. City of New York*, 673 F. Supp. 2d 111, 117 (E.D.N.Y. 2009) ("[W]hile the NYPD clearly concluded that [plaintiff's] perceived limitations disqualified him from the single job of NYPD police officer, those perceived limitations do not transmute, without more, to a perception by the City that [plaintiff] could not perform either a 'class of jobs' or a 'broad range of jobs in various classes.'"). Plaintiffs have cited no evidence that defendants regarded them as substantially limited in their major life activities due to a disability. Therefore, plaintiffs are unable to establish a *prima facie* claim of discrimination.

### III. Burden-Shifting

Even assuming, *arguendo*, that plaintiffs could satisfy their *prima facie* burden under the ADA, the disability discrimination claims must be dismissed because defendants have proffered legitimate, non-discriminatory reasons for their actions, and plaintiffs have failed to show that those reasons are pretextual.

### A. Defendants have proffered legitimate, non-discriminatory reasons for their actions.

The NYPD required each plaintiff to report to the CSU after ostensibly engaging in alcohol-related misconduct that sharply called into question his or her ability to perform their duties as police officers safely and adequately. MacShane, Herlihy, Diamond, and McGeough

were suspected of being under the influence of alcohol while on duty. McNamara, Ordonez, Spaccaforno, Miller, and Fraticelli were involved in alcohol-fueled disputes that required police intervention. Spaccaforno, Schubert, and Hampton each indicated that he posed a danger to himself after drinking alcohol.

The CSU assessed each plaintiff and determined that he or she satisfied the criteria for alcohol abuse, whereupon the NYPD required plaintiffs to obtain treatment to ensure their continued fitness. (*See* Def's Br. (Doc. No. 122) at 29 (ECF pagination); Def's Reply Br. (Doc. No. 128) at 18 (ECF pagination).) In light of the ample evidence documenting the incidents of alcohol-related misconduct, coupled with the proof of the CSU's individualized evaluation of each plaintiff, the Court finds that the NYPD had legitimate, non-discriminatory reasons for requiring plaintiffs to accept varying forms of treatment as a condition of their continued employment. It goes without saying that to allow officers who are suspected of abusing alcohol simply to remain on duty would directly undermine the public trust, not to mention cause danger to both the officer and the public. *See Brennan v. New York Police Dept.*, No. 93-CV-8461 (BSJ), 1997 WL 811543, at *4–6 (S.D.N.Y. May 27, 1997), *aff'd*, 141 F.3d 115 (2d Cir. 1998). Police officers are tasked with duties that routinely involve a "high degree of danger, periods of enormous physical and emotional stress, and the need for strict discipline," *Sauer v. Connelie*, 71 A.D.2d 770, 771 (App. Div. 3d Dep't 1979), and given the rigors of this position – particularly in a densely-populated urban area like New York City – the NYPD justifiably demands that its officers adhere to high standards of conduct and exhibit good judgment both on and off duty. *See id.* at 771 ("[H]igher standards are properly expected of police officers with regard to discipline, fitness and character than pertain to ordinary civil service employees."); *see also Makinen*, 2014 WL 5036747, at *13 (emphasizing that "police officers occupy safety-sensitive

positions which require the carriage and usage of deadly weapons, undeviating concentration, split-second good judgment, and self-control, as well as the ability to tolerate a high degree of danger, [and] periods of enormous physical and emotional stress") (quotations and internal citations omitted).

In each of these cases, there was substantial evidence of alcohol-related misconduct by each plaintiff, evincing conduct that fell markedly short of these necessarily rigorous standards. Indeed, based on the proof put forth by defendants, the NYPD would likely have had grounds to simply terminate some of the officers for the type of misconduct involved. *See Biehunik v. Felicetta*, 441 F.2d 228, 231 (2d Cir. 1971) ("[P]olicemen, who voluntarily accept the unique states of watchman of the social order, may not reasonably expect the same freedom from governmental restraints which are designed to ensure his fitness for office . . . ."); *Merkl v. Allied Bldg. Prods. Corp.*, No. 09-CV-03085 (DLI), 2013 WL 1346032, at *10 (E.D.N.Y. Mar. 28, 2013) (noting that laws prohibiting discrimination on the basis of disability do not protect a person who abuses alcohol "from the consequences of his misconduct"); *see also* 42 U.S.C. § 12114(c)(4) (an employer "may hold an employee who [] is an alcoholic to the same qualification standards for employment or job performance and behavior that such entity holds other employees, even if any unsatisfactory performance or behavior is related to the [] alcoholism of such employee"); N.Y.C. Admin. Code § 8-102(16)(c) ("In the case of alcoholism . . . the term 'disability' shall only apply to a person who (1) is recovering or has recovered and (2) currently is free of such abuse.").[18]

---

[18] *See also Maddox v. University of Tennessee*, 62 F.3d 843 (6th Cir. 1995) (holding that university football coach was properly terminated for driving under influence of alcohol, not for alcoholism); *Williams v. Anheuser-Busch, Inc.*, 957 F. Supp. 1246, (M.D. Fla. 1997) (finding that employee's termination for having made disparaging remarks about employer's products when intoxicated did not violate ADA); *Davis v. Safeway, Inc.*, 1996 WL 266128 (N.D. Ca. May 14, 1996) (determining that employee was properly terminated for abusive behavior when drunk); *Rollison v. Gwinnett County*, 865 F. Supp. 1564, 1571 (N.D. Ga. 1994) (concluding that the plaintiff-police officer was "not discharged because he was an alcoholic, but rather he was discharged because of his repeated off-

Instead, the NYPD provided plaintiffs with a confidential process through which they could rehabilitate themselves and their careers. *See Hailey v. New York City Transit Authority*, No. 02-CV-3127 (JG), 2003 WL 22670891, at *7 (E.D.N.Y. Oct. 20, 2003) (noting that the defendant appeared to be a "model employer under the ADA" by enrolling the plaintiff in a drug treatment program instead of terminating her); *see also Brennan*, 1997 WL 811543, at *5 n.9 (citing cases where courts have found that termination in the context of alcohol-related misconduct does not violate ADA). In short, the NYPD had reasonable and non-discriminatory grounds for requiring plaintiffs to undergo evaluation by the CSU and to comply with the CSU's recommended course of treatment.

In a similar vein, defendants have articulated legitimate, non-discriminatory reasons for suspending or terminating those particular plaintiffs who refused treatment. The NYPD is a highly-regulated paramilitary organization that depends on an established chain of command. By joining the NYPD, plaintiffs accepted that they would be expected to follow orders and would be subject to discipline if they refused to do so. Following incidents of alcohol-related misconduct, Miller, McNamara, Herlihy, Diamond, and MacShane were all ordered to enter and complete alcohol treatment programs. Although expressly warned about the consequences of noncompliance, each of those plaintiffs refused to follow the order to undergo and complete treatment, some repeatedly. Insofar as the NYPD suspended these officers and, in the case of Miller and Herlihy, terminated them, the officers' insubordination constitutes a legitimate, non-discriminatory reason for such disciplinary actions. *See, e.g.*, *Nieves v. Angelo, Gordon & Co.*, 341 F. App'x 676, 679 (2d Cir. 2009) (insubordination and failure to complete assigned tasks furnished legitimate reasons for termination); *Matima v. Celli*, 228 F.3d 68, 79 (2d Cir. 2000)

duty conduct," and that "[r]equiring a police officer to abide by the law, both on and off-duty, is not discrimination solely on the basis of a handicap").

(unseemly confrontations with supervisors and outright insubordination furnished legitimate business reasons for termination); *Hartley v. Rubio*, 785 F. Supp. 2d 165, 178–79 (S.D.N.Y. 2011) ("It is well-settled that an employer may permissible terminate an employee based on inappropriate comments, perceived insubordination, or disruptive behavior in the workplace."); *Ponniah Das v. Our Lady of Mercy Med. Ctr.*, No. 00-CV-2574 (JSM), 2002 WL 826877, at *9 (S.D.N.Y. Apr. 30, 2002) ("Unwillingness to follow a supervisor's orders is a legitimate nondiscriminatory reason for terminating an employee's employment.").

### B. Plaintiffs have failed to demonstrate pretext.

The burden thus shifts back to plaintiffs to demonstrate that defendants' stated reasons were merely a pretext for unlawful discriminatory intent. Plaintiffs' principal argument is that they are not in fact alcoholics, but were falsely diagnosed as such and forced into treatment by unqualified counselors using unreliable assessments based on stereotypes about alcoholism – counselors zealous to compel officers into treatment for alcoholism in nearly any and every situation. In support of this position, plaintiffs point to a large number of paragraphs in their consolidated counterstatements that purport to dispute the circumstances of the incidents of misconduct and the legitimacy of the CSU's diagnoses, maintaining that this "clearly establishes issues of fact with respect to pretext." (Pl's Br. (Doc. No. 126-1) at 49; *see* Pl's 56.1 Consolidated Counterstmts (05-CV-6021, Doc. No. 125) ¶¶ 37–91, 106–56, 213–38, 247–69, 289–335, 375–416, 432a–432bbb, 473–503, 529–39, 600–55; Miller Aff. (05-CV-6024, Doc. No. 126); Miller 56.1 (05-CV-6024, Doc. No. 125).)

However, in a discrimination case, the Court is "decidedly not interested in the truth of the allegations against plaintiff[s]. [The Court is] interested in what '*motivated* the employer'; the factual validity of the underlying imputation against the employee is not at issue."

*McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) (citations

omitted) (emphasis in original); *see Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133,

146–47 (2000) ("The ultimate question is whether the employer intentionally discriminated, and

proof that the employer's proffered reason is unpersuasive, or even obviously contrived, does not

necessarily establish that the plaintiff's proffered reason . . . is correct. In other words, [i]t is not

enough . . . to *dis*believe the employer; the factfinder must believe the plaintiff's explanation of

intentional discrimination.") (quotations and citations omitted); *Koleskinow v. Hudson Valley

Hosp. Ctr.*, 622 F. Supp. 2d 98, 111 (S.D.N.Y. 2009) ("Where a plaintiff has been terminated for

misconduct, the question is not whether the employer reached a correct conclusion in attributing

fault [to the plaintiff] . . . , but whether the employer made a good-faith business determination.")

(quotations omitted); *Rodriguez v. City of New York*, 644 F. Supp. 2d 168, 187–88 (E.D.N.Y.

2008) ("[T]he fact that an employee disagrees with the results of an employer's decision

regarding termination, or even has evidence that the decision was objectively incorrect or was

based on a faulty investigation, does not automatically demonstrate, by itself, that the employer's

proffered reasons are a pretext for termination."); *Argueta v. North Shore Long Island Health

Sys., Inc.*, No. 01-CV-4031(JG), 2003 WL 22670915, at *5 (E.D.N.Y. Nov.6, 2003) (where

employer's alleged reason for firing the plaintiff was that she had struck a co-worker, the

"relevant inquiry [wa]s not what happened [– *i.e.*, whether the employee "actually struck her

coworker" –] but rather, what the *decisionmakers believed* happened") (emphasis in original);

*Agugliaro v. Brooks Bros., Inc.*, 927 F. Supp. 741, 747 (S.D.N.Y. 1996) ("Even assuming

defendants were wrong in their belief that plaintiff had engaged in sexual misconduct, what is

significant is that they based their decision to dismiss plaintiff on that belief, and not on his age,

gender, or pension status.").

Thus, in order to demonstrate a genuine issue of material fact as to pretext, plaintiffs must offer evidence that defendants acted with discriminatory intent or bad faith. Plaintiffs have failed to carry this burden. Indeed, they have offered no evidence that discriminatory animus or bad faith motivated defendants' actions. Plaintiffs have failed to identify any proof suggesting, for example, that defendants exhibited hostility toward them based on their perceived disability, treated them differently than similarly-situated officers, or applied different procedures or standards to them.[19] Furthermore, plaintiffs have not offered evidence that the public safety and institutional rationales proffered by defendants are in any way false. Plaintiffs instead invite the Court to infer that defendants acted with discriminatory intent or bad faith based purely on their contention that they were supposedly misdiagnosed as alcoholics by CSU personnel. But the lion's share of the uncontroverted evidence in the record – including contemporaneous incident reports and the CSU's notes – reflects that the NYPD was motivated by the good-faith belief that each plaintiff had engaged in serious alcohol-related misconduct and that continued alcohol use could negatively affect each plaintiff's ability to perform his or her duties, thereby compromising the safety of the public.

Under the circumstances of this case, the evidence is therefore insufficient to permit a reasonable trier of fact to find that defendants' actions were engendered by any form of disability discrimination. *See Reeves* 530 U.S. at 148 (noting that "an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory

_____

[19] It is here where this case differs from *Miners v. Cargill Communications, Inc.*, 113 F.3d 820 (8th Cir. 1997). Plaintiffs argue that *Miners* stands for the proposition that an employer who lacks actual knowledge that an employee is an alcoholic cannot require the employee to enter alcohol treatment. (*See* Pl's Br. at 18.) However, in *Miners*, the Eighth Circuit reversed the district court's grant of summary judgment because it found that the plaintiff had "presented evidence from which a reasonable jury could conclude that [the defendant's] proffered reason for firing her was a pretext for discrimination," *id*. at 825, including that the policy that was purportedly violated was never communicated to the plaintiff, that the policy was specifically created to target the plaintiff, and that members of management engaged in the same conduct as plaintiff but were not disciplined. *See id.* at 824. Here, plaintiffs have presented no such comparable evidence, and thus their reliance on *Miners* is misplaced.

reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred."); *James v. New York Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000) (holding that although the plaintiff satisfied the minimal standard for a *prima facie* case and offered evidence that arguably would allow factfinder to conclude that employer's explanation was false, summary judgment appropriate because evidence was insufficient to show that discrimination was reason for discharge); *Kolesnikow*, 622 F. Supp. 2d at 114 ("Where an employee's *prima facie* case and showing of pretext are as weak as they are here, and where, as here, there is strong evidence weighing against an inference of discriminatory intent, summary judgment for the employer is appropriate."); *Iverson v. Verizon Commc'ns*, No. 08-CV-8873 (SAS), 2009 WL 3334796, at *4–6 (S.D.N.Y. Oct. 13, 2009) (finding that the plaintiff failed to raise a triable issue regarding pretext where no proof offered contesting the defendant's assessment of his work performance); *Graham v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 451 F. Supp. 2d 360, 371 (D. Conn. 2006) (finding that the plaintiff bringing a "regarded as" ADA claim failed to show pretext where "all evidence suggests that [the plaintiff] was terminated for precisely the reasons stated by [the defendant]" and there was no evidence beyond the plaintiff's "rank speculation" to suggest otherwise).

Plaintiffs' assertion that the CSU's assessment process was unreliable and invalid, (*see, e.g.*, Pl's Br. at 50; Goldberg Decl. Ex. VV (Doc. 123-11) (Report of Dr. John McDonald)), does not change this conclusion. An employer's use of "bizarre or duplicitous processes might strengthen a plaintiff's showing of pretext," *McPherson*, 457 F.3d at 216 n.7, but nothing is bizarre or duplicitous about the process that defendants utilized here. Notably, the diagnostic interview form was only one part of the CSU's assessment process and was not used to arrive at

a definitive diagnosis.  (*See* Def's 56.1 ¶¶ 9–12.)  The CSU counselors also reviewed NYPD

records, conducted interviews with plaintiffs' family, friends, and colleagues, and spoke to each

plaintiff about his or her use of alcohol.  Then, using all of this information, the CSU counselors

consulted with one another to determine whether to refer the officer to outpatient and/or inpatient

alcohol treatment.  Although it may not have been the most rigorous conceivable approach, given

the obvious risks to public safety in allowing a police officer who is abusing alcohol to continue

on full duty, the CSU's assessment and diagnostic procedures were certainly reasonable under

the circumstances – in other words, those procedures provided, at the very least, a good-faith

basis for requiring that plaintiffs seek treatment.[20]

    Therefore, at most, construing all possible inferences in plaintiffs' favor, the evidence

merely suggests that defendants conducted imperfect assessments and were mistaken in their

conclusions – *not* that they subjected plaintiffs to adverse employment actions because of any

discriminatory animus or prejudice toward perceived alcoholics.  *See DeFina v. Meenan Oil Co.,*

*Inc.*, No. 10-CV-5068 (JFB), 2013 WL 596622, at *11 (E.D.N.Y. Feb. 15, 2013) ("Plaintiff's

arguments raise issue only as to the accuracy or the wisdom of defendants' decision to terminate

plaintiff, but fail to create a triable issue of fact as to whether the proffered reasons for plaintiff's

termination were a pretext for discrimination."); *Koleskinow,* F. Supp. 2d at 111 ("Where a

plaintiff has been terminated for misconduct, the question is not 'whether the employer reached a

correct conclusion in attributing fault [to the plaintiff] . . . , but whether the employer made a

good-faith business determination.'") (quoting *Baur v. Rosenberg, Minc, Falkoff & Wolff*, No.

07-CV-8835 (GEL), 2008 WL 5110976, at *5 (S.D.N.Y. Dec. 2, 2008)); *see also Graham v.*

*Long Island R.R.*, 230 F.3d 34, 44 (2d Cir. 2000) (holding that even if the plaintiff could

---

[20] Insofar as the *Makinen* Court, based on the record before it, found sufficient evidence to create a material issue of fact concerning whether the CSU's diagnostic methodologies were unreasonable, this Court's analysis does not hinge on that determination for the reasons already propounded at length in this opinion.

demonstrate that failed drug test proffered by the defendant as ground for dismissal was erroneous, that showing would not demonstrate that reliance on test was pretext for discrimination); *Duviella v. JetBlue Airways Corp.*, No. 04-CV-5063 (NGG), 2008 WL 1995449, at *4–5 (E.D.N.Y. May 6, 2008) *aff'd sub nom*, *Duviella v. JetBlue Airways*, 353 F. App'x 476 (2d Cir. 2009) (finding insufficient evidence of pretext where the plaintiff presented evidence that employer's investigation was not thorough because employer's conclusions were reasonable under the circumstances).

Finally, the argument of Miller, McNamara, Herlihy, Diamond, and MacShane that they were justified in refusing to obey the orders to enter treatment because those orders were supposedly unlawful is devoid of merit. "There is nothing unlawful about an employer requiring that an employee with an alcohol addiction enter an inpatient treatment facility as a condition of continued employment." *MacShane*, 2007 WL 1062936, at *8 (citing cases); *see Mayo v. Columbia Univ.*, No. 01-CV-2002 (LLM), 2003 WL 1824628, *6–7 (S.D.N.Y. Apr. 7, 2003) (finding that the plaintiff's failure to comply with conditions of alcohol treatment program was a legitimate, non-discriminatory basis for termination under ADA); *Roberts v. Bratton*, 233 A.D.2d 102, 103 (App. Div. 1st Dep't 1996) (holding that police department had authority to issue order directing police officer to enter inpatient alcohol rehabilitation program and that officer had no justification for refusing to obey order). This is especially true with an employer like the NYPD, whose mission is to protect the public and that equips its officers with deadly weapons. Far from being unlawful, requiring a police officer suspected of alcohol-related issues to seek evaluation and, if appropriate, alcohol treatment is the height of prudence. These plaintiffs have simply failed to offer any evidence suggesting that the suspensions or terminations from refusing treatment were different than those given to similarly-situated

officers, out of line with the NYPD's normal disciplinary process, or otherwise engendered by discriminatory intent or bad faith.

In short, although the Court recognizes that plaintiffs believe that they were treated harshly and unjustly, "it is not the province of this Court . . . to second guess the nondiscriminatory business decisions" of an employer, *Argueta*, 2003 WL 22670915, at *9, especially where, as here, the non-discriminatory decision implicates a police officer's fitness for office. Defendants' proffered reasons for requiring that plaintiffs seek alcohol treatment and disciplining those who failed to do so were both non-discriminatory and responsive to legitimate concerns. Because plaintiffs have not adduced any evidence tending to demonstrate that the defendants' actions or procedures were influenced by discriminatory animus or bad faith, their disability discrimination claims under the ADA fail. *See*, *e.g.*, *Duviella v. JetBlue Airways*, 353 F. App'x 476, 477 (2d Cir. 2009); *Fall v. N.Y. St. United Teachers,* 289 F. App'x 419, 421–22 (2d Cir. 2008); *Farina v. Branford Bd. of Educ.*, 458 F. App'x 13, 16 (2d Cir. 2011). Accordingly, defendants' motion for summary judgment as to plaintiffs' disability discrimination claims under the ADA is granted.

## IV. Retaliation under the ADA

To establish a *prima facie* case of retaliation under the ADA, plaintiffs must show: (1) that they engaged in an activity protected by the ADA; (2) that defendants knew of the activity; (3) that an adverse employment action took place; and (4) that there exists a causal connection between the protected activity and the adverse employment action. *See Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002). As with other discrimination claims, once a *prima facie* retaliation case has been established, the burden shifts to defendants, who must then assert a non-discriminatory reason for such adverse action. *See Shepheard v. New York City*

*Correctional Dept.*, 360 F. App'x 249, 251 (2d Cir. 2010); *Treglia*, 313 F.3d at 721. If

defendants can do so, the burden shifts back to plaintiffs to show that defendants' proffered

reason is pretextual. *Shepheard*, 360 F. App'x at 251; *Treglia*, 313 F.3d at 721. In assessing

whether a plaintiff has established that an adverse employment action was motivated by

discriminatory retaliation, "there are two distinct ways for a plaintiff to prevail – either by

proving that a discriminatory motive, more likely than not, motivated the defendants," or by

"proving both that the reasons given by the defendants are not true and that discrimination is the

real reason for the actions." *Summa v. Hofstra Univ.*, 708 F.3d 115, 129 (2d Cir. 2013) (quoting

*Gordon v. New York City Bd. Of Educ.*, 232 F.3d 111, 117 (2d. Cir. 2000) (quotations omitted).

Diamond, Spaccaforno, McGeough, and Miller were all referred back to the CSU and

ordered to undergo additional treatment after testifying (at their depositions in this lawsuit) that

they were drinking alcohol again. Assuming, *arguendo*, that these plaintiffs have established

*prima facie* retaliation claims on the basis of this series of events, their causes of action must be

still be dismissed. That is because defendants have articulated legitimate, non-discriminatory

reasons for these additional referrals that plaintiffs have failed to rebut.[21]

In that regard, defendants have offered evidence that whenever the NYPD discovers that

an officer previously treated by the CSU has resumed drinking, the officer is referred back to the

CSU for further assessment and treatment if a relapse is confirmed. (Eichenholtz Decl. Ex. 1

(Doc. No. 120-1) ¶¶ 36–37; Eichenholtz Decl. Ex. 221 (Doc. No. 127) at 24–25, ¶¶ 6–9 (ECF

---

[21] None of the other plaintiffs can establish a viable *prima facie* claim for retaliation. MacShane, McNamara, Fraticelli, Ordonez, Schubert, and Hampton were all referred to the CSU before the filing of the EEOC charge or the instant lawsuit, so there is no causal connection between any purported protected activity and adverse employment action. Furthermore, nothing in the record indicates that these plaintiffs suffered any adverse employment action as a result of bringing their lawsuits. Plaintiffs argue that Herlihy was retaliated against by being suspended after objecting to treatment, but this is nothing more than a restatement of his principal disability discrimination claim, which the Court already found to be baseless. Thus, to the extent that any of these plaintiffs are pressing claims for retaliation, their claims are dismissed.

pagination).)  Because these plaintiffs testified during their depositions that they were once again drinking alcohol, the NYPD referred them back to the CSU for further assessment and treatment in conformity with its stated policy.  This was a legitimate, non-discriminatory reason for the second referrals.  *See Zerilli-Edelglass v. New York City Transit Authority*, No. 04-CV-549 (NG), 2007 WL 2261652, at *7–8 (E.D.N.Y. Aug. 2, 2007), *aff'd*, 353 F. App'x 621 (2d Cir. 2009) (finding employer's compliance with pre-existing policy to be legitimate, non-discriminatory reason for purported adverse employment action forming basis of retaliation claim); *Zeigler v. Marriott Int'l, Inc.*, No. 03-CV-7688 (RWS), 2005 WL 1022431, at *15–16 (S.D.N.Y. May 2, 2005) (holding that administration of existing policy was legitimate, non-retaliatory reason for dismissal).

In response, plaintiffs argue that there "remains a significant issue of fact" as to how many other officers were required to participate in a second round of treatment, and they contend, without citation to any evidence in the record, that "only members of this lawsuit were forced into a second term of inpatient rehabilitation."  (Pl's Br. at 69.)  Plaintiffs further argue that the "[d]efendants have offered no evidence that other people who were once again perceived by the Counseling Unit as alcoholics were sent for additional terms of inpatient treatment, other than the individuals in this lawsuit."  (*Id.*)  However, since defendants proffered a legitimate, non-discriminatory basis for the second referrals, it is plaintiffs' burden to offer evidence showing that a material issue of fact exists on the question of whether this reason was pretextual. *See, e.g.*, *Treglia*, 313 F.3d at 721 (noting that once a defendant articulates a legitimate, non-discriminatory reason for the challenged employment decision, "the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation") (quotations and citation omitted);

*Kemp v. Metro-N. R.R.*, 316 F. App'x 25, 27 (2d Cir. 2009) (a showing of a legitimate, non-discriminatory reason "rebuts the presumption raised by the *prima facie* case, at which point the burden shifts back to the plaintiff to prove, by a preponderance of the evidence, that the real reason for the adverse employment decision was discrimination") (quotations and citations omitted); *Widomski v. State Univ. of New York (SUNY) at Orange*, No. 09-CV-7517 (KMK), 2013 WL 1155439, at *12 (S.D.N.Y. Mar. 20, 2013) (noting that "in order to survive summary judgment, Plaintiff must offer some evidence that the adverse action was motivated, at least in part, by discrimination," and citing cases).

Plaintiffs have failed to cite to anything in the record supporting their contention that only they were required to receive additional treatment. Plaintiffs have not identified anything in the record to rebut the CSU commanding officer's statement that officers not involved in the lawsuit have been referred back to the CSU under similar circumstances. Indeed, plaintiffs' contention is belied by the fact that some of these very plaintiffs were *not* referred back to the CSU following their depositions. Fraticelli, Schubert, and Ordonez were active NYPD members upon being deposed, they denied drinking alcohol, and the NYPD did not refer them back to the CSU, which is consistent with defendants' stated policy. (*See* Eichenholtz Decl. Ex. 1 ¶ 38.) Hence, plaintiffs' unsupported assertion that only they were forced into a second term of treatment would not permit a rational fact finder to conclude that plaintiffs were referred back to the CSU in retaliation for their lawsuits. Defendants are therefore entitled to summary judgment on plaintiffs' ADA retaliation claims. *See Shepheard*, 360 F. App'x at 251 (affirming grant of summary judgment on ADA retaliation claim where the plaintiff failed to establish that the defendants' proffered reason for her termination was a pretext for discrimination); *Kemp*, 316 F.

App'x at 27 (same); *see also Noel v. BNY-Mellon Corp.*, No. 11-CV-4478, 2013 WL 978725, at

*1 (2d Cir. Mar. 14, 2013) (same).

## V.     Disability Discrimination and Retaliation under State and City Law

Plaintiffs have also brought claims under the NYSHRL and the NYCHRL against all

defendants for discrimination and retaliation on the basis of disability.  (*See* Pl's 56.1 ¶ 1.)

Because claims under those state and city statutes are subject to *McDonnell Douglas* burden

shifting, *see, e.g.*, *Kerman–Mastour v. Fin. Indus. Regulatory Auth., Inc.*, 814 F. Supp. 2d 355,

366 (S.D.N.Y. 2011), and because, as described above, defendants have offered legitimate, non-

discriminatory reasons for their actions that plaintiffs have failed to rebut, defendants are entitled

to summary judgment on those claims as well.  *See Doe v. Major Model Mgmt. Inc.*, 11 CV 6182

(KBF), 2012 WL 763556, at *10 (S.D.N.Y. Mar. 9, 2012) (citing *Fall v. N.Y. St. United*

*Teachers,* 289 F. App'x. 419, 422 (2d Cir. 2008) and *Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d

161, 169 n.2 (2d Cir. 2006)); *see also Melie v. EVCI/TCI College Admin.*, 374 F. App'x 150, 154

(2d Cir. 2010) (noting that the plaintiff's failure to present genuine issue of fact regarding pretext

doomed both federal and NYCHRL claims); *Vinokur v. Sovereign Bank*, 701 F. Supp. 2d 276,

291–92 (S.D.N.Y. 2010).[22]

---

[22] This is so even under the more liberal construction given to NYCHRL claims.  *See Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009); *Ugactz v. United Parcel Service, Inc.*, No. 10-CV-1247 (MKB), 2013 WL 1232355, at *14 (E.D.N.Y. Mar. 26, 2013) (noting that the definition of a disability is broader under the NYCHRL than under the ADA).

## VI.    False Arrest under § 1983

Herlihy also brings a false arrest claim against Captain Frank Valuzzi, Lieutenant Brian Doherty, and the City based on his arrest for driving under the influence on October 21, 2005.[23] The elements of a false arrest claim under 42 U.S.C. § 1983 are "substantially the same" as the elements of a false arrest claim under New York law.  *Posr v. Doherty,* 944 F.2d 91, 96 (2d Cir. 1991).  To establish a claim for false arrest under New York law, a plaintiff must show that: (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to confinement; and (4) the confinement was not otherwise privileged.  *See Singer v. Fulton Cnty. Sheriff,* 63 F.3d 110, 118 (2d Cir. 1995) (citing *Broughton v. State,* 37 N.Y.2d 451, 456 (1975)).  "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983."  *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir. 1996) (quotations and citation omitted); *see Decker v. Campus,* 981 F. Supp. 851, 856 (S.D.N.Y. 1997) ("If there existed probable cause at the time of the arrest, the arrest is 'privileged,' and the individual has no constitutional or statutory claim against the officer who made the arrest.").

Probable cause exists where "officers have knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Zellner v. Summerlin,* 494 F.3d 344, 368 (2d Cir. 2007).  In order to determine whether probable cause existed, courts must consider the "totality of the circumstances" in light of the facts known to the arresting officer at the time of the arrest.  *See Jenkins v. City of N.Y.,* 478 F.3d 76, 90 (2d Cir. 2007) ("Probable cause is, of course, evaluated on the totality of the circumstances."); *Lowth*

---

[23] Herlihy does not allege that defendants Sweeney and Gimblet, who are both members of the CSU, were involved in his arrest.

*v. Town of Cheektowaga,* 82 F.3d 563, 569 (2d Cir. 1996) ("Courts evaluating probable cause for an arrest must consider those facts available to the officer at the time of the arrest and immediately before it.").

Here, Herlihy's false arrest claim against defendants fails because defendants clearly had probable cause to arrest him. It is undisputed that on the morning of October 21, 2005, Herlihy was driving a police vehicle when he and his partner were ordered to return to the precinct stationhouse after the NYPD received a complaint that one of them had exited the vehicle, placed a beer bottle on the ground, and publicly urinated. It is further uncontested that when Herlihy arrived at the stationhouse, three different officers – including Valuzzi and Doherty – detected alcohol on his breath and concluded that he was unfit for duty due to intoxication. Herlihy claims that questions of fact exist about which officer arrested him and what those officers knew, and argues that videotape evidence reflects that he was not driving erratically. But Herlihy makes no meaningful attempt to dispute the fact that he was driving that night, that the NYPD knew that he was driving that night, and that both Valuzzi and Doherty smelled alcohol on Herlihy's breath and concluded that he was unfit for duty. Given these undisputed facts, and considering the totality of the circumstances, the Court finds that it was reasonable for Valuzzi and Doherty to conclude that Herlihy had committed an offense. *See, e.g.*, N.Y. Vehicle and Traffic Law § 1192(3) ("No person shall operate a motor vehicle while in an intoxicated condition."). Valuzzi and Doherty, therefore, had probable cause to arrest Herlihy, and these defendants are entitled to summary judgment on Herlihy's false arrest claim.[24]

---

[24] Even if there were a constitutional violation here, Valuzzi and Doherty would be entitled to qualified immunity. An officer is entitled to qualified immunity if "it was objectively reasonable for the [officer] to believe that his action did not violate" the law. *Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89, 103 (2d Cir. 1999) (quoting *Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998) (quotations omitted). For false arrest claims, qualified immunity is appropriate where: (1) it was objectively reasonable for the officer to believe that there was probable cause to make the arrest; or (2) reasonably competent officers could disagree as to whether there was probable cause to arrest. *See Caceres v. Port Auth. of N.Y. & N.J.*, 631 F.3d 620, 622 (2d Cir. 2011). Since several different

To the extent that Herlihy is pressing a claim against the City, that claim must fail as well. Because the individual officers had probable cause to arrest Herlihy, the City cannot be held liable. *See City of L.A. v. Heller*, 475 U.S. 796, 799 (1986); *Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006) (observing that there must be an underlying constitutional violation to support a *Monell* claim); *Graham v. City of N.Y.*, No. 08-CV-3518 (KAM), 2011 WL 3625074, at *13–14 (E.D.N.Y. Aug. 17, 2011) (finding that where there was no constitutional injury, there was no *Monell* claim). Furthermore, even if the officers lacked probable cause, Herlihy has not established that the City can be held liable for that violation. To hold a municipality liable under § 1983, a plaintiff must demonstrate that a municipal policy or custom caused the violation of the plaintiff's constitutional rights. *See Wray v. City of N.Y.,* 490 F.3d 189, 195 (2d Cir. 2007); *see also Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978). Herlihy has established nothing about the NYPD's policies, customs, or training practices. He may believe that what was done in this particular situation by these particular officers was problematic, but Herlihy has wholly failed to establish anything beyond, at best, that a "particular officer may be unsatisfactorily trained," which "will not alone suffice to fasten liability." *City of Canton v. Harris,* 489 U.S. 378, 390–91 (1989); *Richards v. City of N.Y.,* 433 F. Supp. 2d 404, 429–30 (S.D.N.Y. 2006) (granting summary judgment where the plaintiff provided "no evidence as to when [the defendant] conducted training programs, how they were conducted, [or] whether better or different training could have prevented the conduct").

---

officers detected alcohol on his breath and knew that Herlihy had just been driving an NYPD vehicle, it was objectively reasonable for these officers to conclude that there was probable cause to arrest him for driving under the influence. Furthermore, even if, as Herlihy insists, several other officers believed that he was not intoxicated, at most this would show that reasonably competent officers disagreed about whether there was probable cause, which would still entitle Valuzzi and Doherty to qualified immunity.

In short, the arresting officers had probable cause to arrest Herlihy for driving under the influence of alcohol or are entitled to qualified immunity, and Herlihy has failed to establish that the purported constitutional violation was caused by a municipal policy. Accordingly, defendants are entitled to summary judgment on Herlihy's false arrest claim under § 1983.

## VII. Hostile Work Environment Claims

Plaintiffs bring hostile work environment claims on the basis of disability under the NYSHRL and the NYCHRL. McGeough also brings gender-based hostile work environment claims under Title VII, the NYSHRL, and the NYCHRL. For the reasons stated below, each of these claims is dismissed.

### A. Title VII and NYSHRL Claims

To state a claim for a hostile work environment in violation of Title VII or the NYSHRL, "a plaintiff must plead facts that would tend to show that the complained-of conduct: (1) is objectively severe or pervasive – that is, . . . creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [protected characteristic]." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (quoting *Gregory v. Daly*, 243 F.3d 687, 691–92 (2d Cir. 2001)). A plaintiff must also show that a specific basis exists for imputing the conduct that created the hostile environment to the employer. *See Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993); *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir. 1997); *see also Summa v. Hofstra Univ.*, 708 F.3d 115, 123–24 (2d Cir. 2013) ("Hostile work environment claims under both Title VII and the NYSHRL are governed by the same standard.").

To support a hostile work environment claim, a plaintiff generally "must prove more than a few isolated incidents of [discriminatory] enmity. Casual comments, or accidental or sporadic conversation, will not trigger equitable relief pursuant to the statute." *Snell v. Suffolk Cnty.*, 782 F.2d 1094, 1103 (2d Cir. 1986) (citations omitted). However, "even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace." *Alfano v. Costello,* 294 F.3d 365, 374 (2d Cir. 2002) (citations omitted). In evaluating a plaintiff's claim, the Court must consider "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Howley v. Town of Stratford,* 217 F.3d 141, 154 (2d Cir. 2000) (citing *Harris,* 510 U.S. at 23). Whereas disparate treatment claims typically focus on discrete harms – such as hiring or termination – a hostile work environment claim requires analysis of the "workplace environment as a whole." *Raniola v. Bratton,* 243 F.3d 610, 617 (2d Cir. 2001); *see Alfano v. Costello,* 294 F.3d 365, 374 (2d Cir. 2002) (determining hostile work environment requires an examination of the totality of the circumstances).

1. **Plaintiffs' disability-based hostile work environment claims under the NYSHRL fail.**

Under this standard, plaintiffs' hostile work environment claims on the basis of disability must be dismissed. Based on this record, no reasonable factfinder could conclude that defendants' conduct was severe or pervasive such that it created an objectively hostile or abusive environment. Nothing in the record suggests that defendants physically threatened or humiliated plaintiffs because of any perceived disability, or used offensive language to demean plaintiffs. Nor does anything in the record demonstrate that defendants' conduct unreasonably interfered with plaintiffs' work performance. Rather, as already described, the uncontroverted record

shows that defendants required plaintiffs to obtain alcohol treatment after plaintiffs appeared to engage in alcohol-related misconduct. Even if plaintiffs were not actually suffering from an alcohol-related disability, these actions alone are insufficient to support a hostile work environment claim. *Cf. St. Louis v. New York City Health & Hosp. Corp.*, 682 F. Supp. 2d 216, 234 (E.D.N.Y. 2010) ("[R]eceipt of negative job evaluations and disciplinary warnings resulting from the failure to meet a work requirement, without more, do not support [a hostile work environment claim]."); *Salerno v. Town of Bedford*, No. 05-CV-7293 (GEL), 2008 WL 5101185, *8 (S.D.N.Y. Dec. 3, 2008) ("Allegations of negative job evaluations or excessive reprimands are insufficient to establish a hostile environment claim.") (citing *Weeks v. N.Y. State (Div. of Parole)*, 273 F.3d 76, 86 (2d Cir.2001)).

Therefore, defendants are entitled to summary judgment on plaintiffs' hostile work environment claims on the basis of disability under the NYSHRL. *See Ugactz v. United Parcel Serv., Inc.*, No. 10-CV-1247 (MKB), 2013 WL 1232355, at *17–18 (E.D.N.Y. Mar. 26, 2013) (dismissing NYSHRL disability-based hostile work environment claim because incidents were not sufficiently pervasive or severe to warrant finding of hostile work environment).

### 2. McGeough's gender-based hostile work environment claims under Title VII and the NYSHRL fail.

McGeough's gender-based hostile work environment claims must also be dismissed. McGeough complains of approximately five instances in which offensive newspaper clippings were placed on her desk, one occasion in which her bullet proof vest was found in the garbage can, and one occasion in which figurines on her desk were arranged to depict sexual acts.[25]

---

[25] In her opposition brief, McGeough also cites to allegations in her complaint, which describe additional offensive incidents, to support her argument that she has established a *prima facie* hostile work environment claim. (*See* Pl's Br. (Doc. No. 126-1) at 72–73.) However, once a party moving for summary judgment demonstrates the absence of a genuine issue of material fact, "the nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Salahuddin v. Goord*, 467 F.3d 263, 273

These incidents were infrequent and not physically threatening in any way. Nor did this conduct interfere with McGeough's work performance. Indeed, McGeough was promoted to sergeant in January 2006 and transferred to another precinct to act as a patrol supervisor. (*See* Def's 56.1 ¶ 767.) "Hostile work environment claims are meant to protect individuals from abuse and trauma that is severe. They are not intended to promote or enforce civility, gentility or even decency." *Ennis v. Sonitrol Mgmt. Corp.,* 02-CV-9070 (TPG), 2006 WL 177173, at *9 (S.D.N.Y. Jan. 25, 2006) (citations omitted). Although the conduct was rude, considering the totality of the circumstances and drawing all inferences in favor of McGeough, the Court nonetheless concludes that no reasonable fact finder could find that the conduct complained of here was objectively severe or pervasive.[26]

Even if the conduct were objectively severe or pervasive, McGeough's claim would still fail since she has presented no evidence of having been subjected to the conduct because of her gender. These incidents began when it was discovered that several thousand dollars were missing from the Squad's club account, which McGeough was managing. Upon this discovery, other detectives in the Squad accused McGeough of being a thief. (*See* Def's 56.1 ¶ 814.) As McGeough testified, the newspaper cutouts that she found on her desk conveyed the message

---

(2d Cir. 2006). Because McGeough has failed to cite admissible evidence in the record in support of these additional allegations, the Court will not consider them. *See* Fed. R. Civ. P. 56(c).

[26] Courts in this circuit have granted summary judgment in favor of employers that have engaged in conduct far more severe than that alleged here. *See, e.g., Dayes v. Pace Univ.*, No. 98-CV-3675 (WHP), 2000 WL 307382, at *1, *4–5 (S.D.N.Y. Mar. 24, 2000), *aff'd*, 2 F. App'x 204 (2d Cir. 2001) (granting summary judgment to the defendant where the plaintiff was subjected to six sexual comments, multiple requests for dates, and screaming by her supervisor, as well as touched on the back); *Lucas v. S. Nassau Cmts. Hosp.*, 54 F. Supp. 2d 141, 147–48 (E.D.N.Y. 1998) (denying NYSHRL hostile work environment claim where supervisor brushed against the plaintiff three times, touched the plaintiff three times, briefly touched the plaintiff's back or shoulders five to seven other times, asked about the color of the plaintiff's underwear, stated that the plaintiff wanted to "go to bed" with her, and stated "fuck you" to the plaintiff on two occasions); *Ricard v. Kraft Gen. Foods, Inc.*, No. 92-CV-2256 (GLG), 1993 WL 385129, at *3–4 (S.D.N.Y. Mar. 16, 1993), *aff'd*, 17 F.3d 1426 (2d Cir. 1994) (four sexually-oriented incidents insufficient to withstand summary judgment); *see also Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 319 (2d Cir. 1999) (affirming grant of summary judgment to the defendant where sexually provocative pictures of nude men were displayed in shared office).

that McGeough "was a bitch" and "had taken money." (Ex. 203 (Doc. No. 120-19) at 18.) Thus, it appears that any hostility McGeough experienced was a result of her colleagues' belief that she had stolen money from them, and not because she was a woman. (*See* Pl's 56.1 ¶¶ 829, 832 (McGeough testifying that she did not know whether these acts occurred because she is a woman, but stating that it "was because I'm Una McGeough").)

Because the conduct complained of here was neither severe nor pervasive enough to create an objectively hostile work environment, and because McGeough has presented no evidence that the conduct was based on her gender, McGeough's Title VII and NYSHRL hostile work environment claims cannot survive summary judgment. *See Forts v. City of N.Y. Dep't of Corr.*, No. 00-CV-1716 (LTS), 2003 WL 21279439, at *4 (S.D.N.Y. June 4, 2003) ("An environment that would be equally harsh for all workers, or that arises from personal animosity, is not actionable under the civil rights statutes."); *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 670, 674–75 n.4 (S.D.N.Y. 2012) (noting that standards are the same under Title VII and the NYSHRL, and dismissing the plaintiff's hostile work environment claims under both statutes on the same basis).

### B.    NYCHRL Claims

As previously noted, claims under the NYCHRL are reviewed "independently from, and more liberally than, federal or state discrimination counterparts." *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d at 278 (quoting *Williams v. N.Y. City Hous. Auth.*, 61 A.D.3d 62, 66 (App. Div. 1st Dep't 2009)). The NYCHRL imposes liability for harassing conduct that does not qualify as "severe or pervasive," and "questions of 'severity' and 'pervasiveness' are applicable to consideration of the scope of permissible damages, but not to the question of underlying liability." *Williams,* 61 A.D.3d at 76. In order to survive summary judgment, a plaintiff need

only adduce evidence "that she has been treated less well than other employees because of her [protected status]." *Id.* at 39. "Nonetheless, even under the NYCHRL, 'petty, slight, or trivial inconveniences' are not actionable." *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 579 (S.D.N.Y. 2011) (quoting *Williams*, 61 A.D.3d at 80).

### 1. Plaintiffs' hostile work environment claims under the NYCHRL fails.

Even under this more liberal standard, plaintiffs' hostile work environment claims still fall short. Under the NYCHRL, it is unlawful for an employer to discriminate against an employee because of a perceived disability, *see* N.Y.C. Admin. Code § 8-107(1), but, in the case of alcoholism, an employee is suffering from a "disability" only if he or she is recovering or has recovered from alcoholism, and is currently free from alcohol abuse. *See id.* § 8-102(16)(c). Here, plaintiffs were required to report to the CSU and to attend alcohol treatment following incidents of alcohol-related misconduct, and were therefore not suffering from a disability under NYCHRL. Accordingly, there is no evidence in the record that plaintiffs were treated less well than other employees because of a disability. Therefore, plaintiffs' hostile work environment claims under the NYCHRL must be dismissed. *See Ugactz*, 2013 WL 1232355, at *18 n.33 (granting summary judgment on disability-based NYCHRL hostile work environment claim where there was no indication in the record that comments were made because of the plaintiff's disability).

McGeough's NYCHRL gender-based hostile work environment claim fails for an additional reason. As previously set forth, McGeough has not put forward evidence suggesting that she was subject to the allegedly offensive conduct because of her gender. Instead, the undisputed evidence in the record suggests that her colleagues believed that she had stolen from them. The single incident involving the arrangement of animal figurines on McGeough's desk is

not sufficient to give rise to harassing conduct even under the liberal standard of the NYCHRL, nor does not give rise to an inference of gender-based discriminatory animus solely because of its sexual overtones.

Accordingly, defendants are entitled to summary judgment on this basis as to McGeough's hostile work environment claim under the NYCHRL. *See Lennert-Gonzalez v. Delta Airlines, Inc.*, 11-CV-1459 (JMF), 2013 WL 754710, at *18 (S.D.N.Y. Feb. 28, 2013) (granting summary judgment on NYCHRL hostile work environment claim where evidence suggested hostility was based on personal animosity).

## CONCLUSION

For the reasons set forth herein, the Court finds that defendants are entitled to summary judgment on all of plaintiffs' claims. Accordingly, plaintiffs' claims are dismissed in their entirety. The Clerk of Court is directed to enter Judgment accordingly, mail a copy of this Memorandum and Order and the accompanying Judgment to *pro se* plaintiff Miller, and to close the case.

SO ORDERED.

*Roslynn R. Mauskopf*

Dated: Brooklyn, New York
      March 23, 2015

_____
ROSLYNN R. MAUSKOPF
United States District Judge